UNITED STATES of America, Appellee,

v.

William Bull PRINGLE, III,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

James Crawford McAFEE,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Lloyd Cowan PARKER,
Defendant, Appellant.

Nos. 84–1059 to 84–1061.

United States Court of Appeals,
First Circuit.

Argued Oct. 1, 1984.

Decided Dec. 19, 1984.

Rehearing and Rehearing En Banc
Denied Jan. 14, 1985.

Robert F. Muse, Washington, D.C., with whom Ronald Kovner, Washington, D.C., was on brief, for defendant, appellant William Bull Pringle, III.

James W. Lawson, Boston, Mass., with whom Joseph S. Oteri, Oteri, Weinberg & Lawson, Boston, Mass., and Herbert S. Moncier, Knoxville, Tenn., were on brief, for defendant, appellant James Crawford McAfee.

Robert W. Ritchie, Amherst, Mass., for defendant, appellant Lloyd Cowan Parker.

Robert W. Meserve, Sp. Asst. U.S. Atty., and Gary S. Katzmann, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief for appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and WEIGEL,* Senior District Judge.

BOWNES, Circuit Judge.

Defendants-appellants, William Bull Pringle, III, James Crawford McAfee, and Lloyd Cowan Parker, appeal their convictions of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 955a(b) and 955c (count four) and of possessing marijuana with intent to import it into the United States in violation of 21 U.S.C. § 955a(d)(1) (count six).[1] There are four issues before us: (1) whether the stop, boarding, search and seizure of the sailing vessel Nirvana with a cargo of twelve tons of marijuana violated defendants' rights under statutory authority, the fourth amendment or international law; (2) whether the Classified Information Proce-

dures Act was violated; (3) whether count four of the indictment should have been dismissed; and (4) whether the Speedy Trial Act was violated.

## I. THE SEIZURE OF THE NIRVANA

On August 20, 1982, the Coast Guard Cutter Cape Higgon had been ordered to patrol an area northeast of Cape Cod. Its commanding officer, Lieutenant Jost, had been instructed to be on the lookout for a sailing vessel approximately forty to sixty feet in length, possibly flying a foreign flag. Jost was also told that there would be an aircraft in the area and if the aircraft sighted the vessel, he was to board it, that it was suspected of carrying marijuana.

After arriving in the designated patrol area, the cutter received a radio transmission from a Coast Guard helicopter stating that it had sighted a vessel matching the description of the one suspected of carrying marijuana. Based on the information received from the helicopter, the cutter located the Nirvana approximately twenty miles northeast of Thacher's Island, which lies off Cape Ann, Massachusetts.

The cutter followed the Nirvana and closed to about seventy-five yards. The name of the vessel was displayed on a board which was secured to the ship by two bolts, one at either end of the name board. A similar board indicated that the Nirvana's home port was Dover. This method of attaching a nameplate to a vessel violated federal regulations which require that the name either be painted on the hull or each individual letter of the name be screwed into the hull. Using removable nameplates makes it easy to change a vessel's name.

The Nirvana was on a "very extreme starboard heel" and appeared to be "riding low in the water." Lieutenant Jost also noted that the Nirvana flew no flag.

The cutter displayed a stop sign on the bow, turned on its blue light, hoisted a

---

* Of the Northern District of California, sitting by designation.

1. The defendants were charged in a six-count indictment. After some pretrial skirmishing, all counts except four and six were dismissed and defendants entered a conditional plea of guilty to these two counts pursuant to Federal Rule of Criminal Procedure 11(a)(2).

pennant with the international signal to stop –"Lima"– and over the loud hailer ordered the Nirvana to "heave to and stand by to be boarded."

In the ensuing radio communication between the two ships, the Coast Guard was told that the Nirvana's home port was Dover, Delaware, that its last port of call was Falmouth, Maine, and that its destination was Marblehead, Massachusetts. Her announced destination was inconsistent with the course she had been following.

On the assumption that the Nirvana was a United States vessel, a boarding party was sent over under the authority of 14 U.S.C. § 89(a) with orders to perform the standard documentation and safety check and "to check the main compartment for bulk marijuana." On boarding the Nirvana, a Coast Guard officer announced that the action was taken pursuant to 14 U.S.C. § 89(a). The officer proceeded to the main cabin and requested the documentation papers. He was informed that there were none. As he looked around the cabin, the officer noticed numerous packages wrapped in black plastic and tied with twine tape; they appeared to be packages of marijuana. There was a strong smell of perfumed deodorant in the cabin. As the officer looked around further, he saw more black plastic packages and determined that they contained marijuana. He opened one of the packages, saw a green leafy substance, and tested it for THC, the active marijuana ingredient. The test indicated that the substance was marijuana. The cutter was notified of the presence of marijuana on the Nirvana, the defendants were arrested, the vessel was seized, and more than twelve tons of marijuana was confiscated.

It was later ascertained that the Nirvana was registered in the Grand Cayman Islands.

Under these facts, our own precedent compels that the attacks on the boarding, search and seizure of the Nirvana be repelled.

## A. *Fourth Amendment and Statutory Attacks*

Since the fourth amendment and statutory claims are closely related, we consider them together.

The first question is standing. The government urges that defendants have no standing because under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), they had no legitimate expectation of privacy in the area searched nor an interest in the property seized. It is true that defendants have asserted "that they played no part as owners of the boat or the marijuana, or as financiers, or managers of the importation scheme." App. Brief at 2. But they were the only ones aboard the Nirvana at the time of the seizure. They had charge of her day-to-day operations and she was their temporary home. In *United States v. Lochan*, 674 F.2d 960 (1st Cir.1982), we analyzed *Rakas* in detail and the cases leading to it and flowing from it. We concluded that some of the factors relevant to a privacy expectation are "legitimate presence in the area searched, possession or ownership of the area searched or the property seized, prior use of the area searched or the property seized, ability to control or exclude others' use of the property, and a subjective expectation of privacy." *United States v. Lochan*, 674 F.2d at 965.

Both the defendants' claim that they were innocent dupes and the government's argument that they had no standing to assert a fourth amendment defense sink under the heavy weight of the facts. The defendants had a right of privacy in the Nirvana to the extent afforded any crew member of a small sailing vessel on the high seas. We have held that this is a lesser expectation of privacy than people have in their homes and obviates the usual fourth amendment requirement of a search warrant. *United States v. Green*, 671 F.2d 46, 53 (1st Cir.1982).

The statute under which the Coast Guard boarded the Nirvana, 14 U.S.C. § 89(a),[2] is no stranger to this circuit. In *United States v. Hilton*, 619 F.2d 127 (1st Cir. 1980), we held:

> Under this statute, the Coast Guard may stop and board any American flag vessel on the high seas without a warrant and without any particularized suspicion of wrongdoing. Although the statutory language is quite broad, the statute has been consistently construed as limiting such stops—in the absence of probable cause—to the necessary task of conducting safety and document inspections. A more extensive search is permissible only if there is consent or probable cause to believe a crime has been or is being committed. Upon probable cause, the Coast Guard is authorized to seize the vessel and its contents, and to arrest those aboard.
>
> . . . .
>
> We believe the limited intrusion represented by a document and safety inspection on the high seas, even in the absence of a warrant or suspicion of wrongdoing, is reasonable under the fourth amendment.

*Id.* at 131 (footnote and citations omitted). ■ At the time the boarding took place, the Coast Guard had good grounds for believing that, despite the fact she was flying no flag, the Nirvana was an American vessel. The crew was obviously American and had informed the commander of the cutter that the Nirvana's home port was Dover, Delaware. Once aboard the Nirvana, the Coast Guard had authority to conduct a reasonable safety and document inspection. Entering the main cabin for this purpose was entirely proper. The packages of marijuana were in plain view. Discovery of the marijuana justified the arrest of the defendants and seizure of the vessel under 14 U.S.C. § 89(a). *United States v. Hilton*, 619 F.2d at 133.

■ That the Nirvana was not an American vessel but of Grand Cayman registry only postpones the inevitable, it does not change it. In *United States v. Green*, 671 F.2d at 53, we held that, "in addition to permitting proper administrative searches, the fourth amendment allows government officers, who are otherwise authorized, to board and search a vessel on the high seas should they have reasonable and articulable grounds for suspecting that it is engaged in criminal activity." (Footnote omitted.) "This 'reasonable suspicion' standard ... requires less than probable cause to justify a nonadministrative maritime search." *United States v. Marsh*, 747 F.2d 7 at 10 (1st Cir.1984). We find that there was reasonable and articulable grounds here for suspecting that the Nirvana was engaged in criminal activity: she was flying no flag; she had an easily removable nameplate; and she appeared to be riding low in the water.[3] *See United States v. Marsh*, 747 F.2d 7 at 10; *United*

**2. § 89. Law enforcement**

(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

**3.** We have not factored into the grounds for suspecting criminal activity the fact that the Nirvana's announced destination was inconsistent with the course she had been following because this did not become known to the Coast Guard until after the order to stop for boarding was given.

*States v. Green,* 671 F.2d at 53–54; *United States v. Arra,* 630 F.2d 836, 846 (1st Cir. 1980).

■ Defendant's "pretext" argument that the Coast Guard intended to stop and board the Nirvana prior to any indication of suspicious activity also founders on the shoals of our prior cases. In *United States v. Arra,* 630 F.2d at 845–46, we held that the motivation for a particular boarding is not relevant; the test is whether there was an objective basis for the boarding. *See also United States v. Hayes,* 653 F.2d 8, 12 (1st Cir.1981); *United States v. Kincaid,* 712 F.2d 1, 4 (1st Cir.1983). And as we noted in *Kincaid,* the Supreme Court has explicitly stated that an otherwise lawful document search does not become unlawful because the officer might have, in fact, been looking for drugs, not documents. *United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, n. 3 at 2577, 77 L.Ed.2d 22 (1983).

### B. *International Law*

■ The claim that the seizure of the Nirvana violated international law and requires the exclusion of the evidence seized is completely demolished by our decision in *United States v. Hensel,* 699 F.2d 18 (1st Cir.1983). In *Hensel,* we assumed that the search violated international law and, therefore, was not authorized by 14 U.S.C. § 89(a). We held that the exclusionary rule should not be invoked because "[t]he rule of international law in the case at bar is a rule designed to secure peace among

nations, not to protect the privacy of individuals." *Id.* at 30. The international law on which defendants rely is to promote and protect freedom of the seas for nations, not to protect smugglers. *Id.* The defendants, here, as in *Hensel,* simply had no standing to invoke the protection of international law.

No matter what tack they take, the defendants cannot escape the barrier reefs of our precedent.

## II. THE CLASSIFIED INFORMATION PROCEDURES ACT

After indictment, the defendants moved for discovery pursuant to Federal Rule of Criminal Procedure 16 requesting the disclosure of information and the production of materials related in any conceivable way to the surveillance, boarding and seizure of the Nirvana. After a considerable lapse of time, the government moved, pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C.App. §§ 1–16, for an *in camera* hearing "concerning Coast Guard Intelligence matters and classified information now in the possession of the United States Coast Guard." The motion also asked that the court "prevent the release to the defense of classified information in this case." This motion was followed a month later by an application for an *"in camera* lodging of government's *ex parte* application for protective order." This request was made pursuant to Federal Rule of Criminal Procedure 16(d)(1) [4] and §§ 3 and 4 of CIPA.[5] Five weeks subsequent to

---

**4.** Rule 16(d)(1) provides:

(1) **Protective and Modifying Orders.** Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate. Upon motion by a party, the court may permit the party to make such showing, in whole or in part, in the form of a written statement to be inspected by the judge alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the party's statement shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

**5.** Sections 3 and 4 provide:

**§ 3. Protective orders**
Upon motion of the United States, the court shall issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case in a district court of the United States.

**§ 4. Discovery of classified information by defendants**
The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the Information for such classified documents, or to substitute a statement admitting relevant facts that the classified information

the "lodging" application, the government filed an *in camera ex parte* submission consisting of the affidavits of the Secretary of Transportation, Chief of Operations of the United States Coast Guard, and a lieutenant in the Coast Guard, along with the documents sought to be protected.

Following the *in camera ex parte* submission the defendants filed notice of their intent to cause the disclosure of classified information under § 5(a) of CIPA.[6]

The defendants intended to question government witnesses at the hearing on the motion to suppress in regard to the surveillance of the Nirvana.

After further delay, the district court conducted an *ex parte in camera* inspection of the submitted material and concluded that the national security would be damaged if the information and materials sought were disclosed to the defendants or the public. It further found that the surveillance information was neither relevant nor helpful to the defense of the accused nor otherwise essential to a fair adjudication of the case and, hence, not discoverable under Federal Rule of Criminal Procedure 16. At the hearing on the motion to suppress, the district court sustained all the government's objections to questions concerning the surveillance of the Nirvana.

Defendants claim that the district court committed reversible error by failing to follow the procedures required by CIPA. They argue that because they gave notice under § 5(a) of the Act of their intent to disclose or cause to be disclosed classified information, the government had to proceed under § 6 of the Act. Section 6(a)[7] provides for an *in camera* but not an *ex parte* hearing. Defendants contend that since the government did not proceed under § 6 of the Act, the district court lacked authority to exclude classified information from pretrial discovery and the suppression hearing. They also contend that the government's failure to give notice under

would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

6. 18 U.S.C.App. § 5(a) provides:

**(a) Notice by defendant**

If a defendant reasonably expects to disclose or to cause the disclosure of classified information in any manner in connection with any trial or pretrial proceeding involving the criminal prosecution of such defendant, the defendant shall, within the time specified by the court or, where no time is specified, within thirty days prior to trial, notify the attorney for the United States and the court in writing. Such notice shall include a brief description of the classified information. Whenever a defendant learns of additional classified information he reasonably expects to disclose at any such proceeding, he shall notify the attorney for the United States and the court in writing as soon as possible thereafter and shall include a brief description of the classified information. No defendant shall disclose any information known or believed to be classified in connection with a trial or pretrial proceeding until notice has been given under this subsection and until the United States has been afforded a reasonable opportunity to seek a determination pursuant to the procedure set forth in section 6 of this Act, and until the time for the United States to appeal such determination under section 7 has expired or any appeal under section 7 by the United States is decided.

7. 18 U.S.C.App. § 6(a) provides:

**(a) Motion for hearing**

Within the time specified by the court for the filing of a motion under this section, the United States may request the court to conduct a hearing to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding. Upon such a request, the court shall conduct such a hearing. Any hearing held pursuant to this subsection (or any portion of such hearing specified in the request of the Attorney General) shall be held in camera if the Attorney General certifies to the court in such petition that a public proceeding may result in the disclosure of classified information. As to each item of classified information, the court shall set forth in writing the basis for its determination. Where the United States' motion under this subsection is filed prior to the trial or pretrial proceeding, the court shall rule prior to the commencement of the relevant proceeding.

§ 6(b) of the Act was fatal.[8] Based upon their interpretation of CIPA, defendants conclude that their statutory and due process rights were violated.

Defendants' argument ignores the statutory history of the Act, misconstrues its application, and distorts its plain meaning. CIPA was enacted by Congress in 1980 to meet those situations in which a criminal defendant possesses classified information and threatens to disclose it during trial. Prior to CIPA, the government had no way of evaluating the gravity of the danger to national security should the prosecution continue and the information be disclosed. CIPA was enacted in response to what was perceived as "greymail" practiced upon the government. S.Rep. No. 823, 96th Cong., 2d Sess. 4 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad.News 4294, 4297–98.

The purpose of CIPA is to enable the government to ascertain prior to trial the classified information which the defendant possesses so that it can evaluate the effect of its disclosure on national security. Sections 5 and 6 of the Act set out detailed procedures to that end. For an in-depth examination of those sections *see United States v. Collins*, 720 F.2d 1195 (11th Cir. 1983); *United States v. Wilson*, 721 F.2d 967 (4th Cir.1983); *United States v. Wilson*, 732 F.2d 404 (5th Cir.1984). It is clear, however, that §§ 5 and 6 do not apply to this case.

■ None of the defendants here possessed classified information which they threatened to disclose. Quite to the contrary, they were seeking classified information which the government sought to protect. The government properly invoked §§ 3 and 4 of the Act. Section 3 provides: "Upon motion of the United States, the court shall issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case in a district court of the United States." Under § 4, "[t]he court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure." The legislative history clearly establishes that these sections were intended to make explicit the protective orders allowed for limitation of discovery of classified information pursuant to Federal Rule of Criminal Procedure 16. S.Rep. No. 823, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4294, 4298–99.

Section 4 also provides for an *ex parte* examination by the court: "The court may permit the United States to make a request for such authorization in the form of a written statement *to be inspected by the court alone.*" (Emphasis added.)

■ We rule that the government correctly followed the pertinent sections of CIPA in this case and the court's *ex parte in camera* inspection of the documents was authorized under § 4 of CIPA and Federal Rule of Criminal Procedure 16(d)(1).

■ We also reject defendants' contention that the protective orders issued by the district court violated their due process rights. We have reviewed the classified information and agree with the district

---

**8.** 18 U.S.C.App. § 6(b) provides:

**(b) Notice.**

(1) Before any hearing is conducted pursuant to a request by the United States under subsection (a), the United States shall provide the defendant with notice of the classified information that is at issue. Such notice shall identify the specific classified information at issue whenever that information previously has been made available to the defendant by the United States. When the United States has not previously made the information available to the defendant in connection with the case, the information may be described by generic category, in such form as the court may approve, rather than by identification of the specific information of concern to the United States.

(2) Whenever the United States requests a hearing under subsection (a), the court, upon request of the defendant, may order the United States to provide the defendant, prior to trial, such details as to the portion of the indictment or information at issue in the hearing as are needed to give the defendant fair notice to prepare for the hearing.

court that "it was not relevant to the determination of the guilt or innocence of the defendants, was not helpful to the defense and was not essential to a fair determination of the cause." The information was, therefore, properly excluded. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

## III. COUNT FOUR OF THE INDICTMENT

■ Defendants contend that Count Four of the indictment should have been dismissed because it omitted an essential element of the offense charged. Count Four charges:

On or about August 20, 1982, at a point approximately 22 miles East-Northeast of Gloucester, Massachusetts aboard the vessel "Nirvana" and elsewhere,

JAMES CRAWFORD McAFEE,

LLOYD COWAN PARKER

and

WILLIAM BULL PRINGLE, III

each of them being citizens of the United States, did knowingly and intentionally combine, conspire, confederate and agree with each other and with divers persons presently unknown to the Grand Jury, to commit an offense against the United States, to wit, knowingly and intentionally possess with intent to distribute a quantity of marijuana, a Schedule I controlled substance; in violation of Title 21, United States Code, Sections 955a(b) and 955c.

21 U.S.C. § 955a provides in pertinent part:

(a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

21 U.S.C. § 955b is the definition section. 21 U.S.C. § 955c provides:

Any person who attempts or conspires to commit any offense defined in sections 955a to 955d of this title is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

It is basic law that an

indictment is sufficient if the offense is described with sufficient clarity to show a violation of law, and enables the accused to know the nature and cause of the accusation against him and to plead an acquittal or conviction in bar of future prosecution for the same offense. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

*United States v. Fusaro*, 708 F.2d 17, 23 (1st Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 524, 78 L.Ed.2d 708 (1984). "An indictment is generally sufficient if it sets forth the offense in the words of the statute including all the elements." *United States v. Holmes*, 632 F.2d 167, 169 (1st Cir.1980) and the cases cited therein.

There is no merit to defendants' claim; the district court did not err in refusing to dismiss Count Four of the indictment.

## IV. SPEEDY TRIAL ACT VIOLATIONS

Defendants also claim that the indictments should have been dismissed for violations of the Speedy Trial Act, 18 U.S.C. § 3161 et seq. Defendants were indicted on August 31, 1982, and their trial did not commence until December 5, 1983, 463 days later. On June 9, 1983, and October 21, 1983, defendants made motions to dismiss the indictments for violations of the Speedy Trial Act; both motions were summarily denied by the district court.

Some preliminary observations are in order. The Speedy Trial Act requires that a defendant be brought to trial within seventy days of either indictment or first appear-

ance before a judicial officer, § 3161(c)(1), but it also permits the exclusion of delay periods caused by specified kinds of pretrial activity from the computation of this seventy-day period. § 3161(h). The Act can be seen to have a twofold purpose: furthering the interest of both criminal defendants and the public in a speedy trial. "Speedy trial may be of concern to the defendant, as he may want to preserve the means of proving his defense, to avoid a long period of pretrial imprisonment or conditional release, and to avoid a long period of anxiety and public suspicion arising out of the accusation. From the point of view of the public, a speedy trial is necessary to preserve the means of proving the charge, to maximize the deterrent effect of prosecution and conviction, and to avoid, in some cases, an extended period of pretrial freedom by the defendant during which time he may flee, commit other crimes, or intimidate witnesses." *Standards Relating to Speedy Trial* § 1.1 commentary (1968). The Act controls the conduct of the parties and the court itself during criminal pretrial proceedings. Not only must the court police the behavior of the prosecutor and the defense counsel, it must also police itself. The Act is as much aimed at the delay caused by judicial congestion and mismanagement as it is aimed at the deliberate stalling of counsel. 120 Cong.Rec. 41618 (1974) (statement of Sen. Ervin). The Act provides two specific sanctions for impermissible delay. Regardless of whether the seventy-day limit has been exceeded, counsel may be punished for dilatory tactics by the imposition of fines, temporary suspension of the right to practice before the court, or disciplinary reports. § 3162(b). In addition, upon the motion of the defendant, the indictment may be dismissed with *or without prejudice if the seventy-day limit has been exceeded*, either as a result of

counsel's dilatory tactics or delay caused by the court itself. § 3162(a)(2). It is the dismissal sanction which has emerged as the primary means for enforcing the Act because defendants' interest in the dismissal of indictments, preferably with prejudice, usually exceeds the interest of the courts or prosecutor in adhering to the strict timetables set up by the Act.

▇▇ When a motion for dismissal is brought under the Speedy Trial Act, the district court must review the course of events from the indictment up to the filing of the motion to dismiss, tracking each motion and proceeding which occurred during that period and evaluating the resultant delay under the Act. For the most part, exclusion of periods of delay is not discretionary; the statute sets out quite specifically what can be excluded and what cannot be excluded. Certain delays, however, may be excluded at the discretion of the district court, as in the granting of a continuance [9] or the exclusion of "reasonably necessary" pretrial motion delay.[10]

▇▇ Appellate review of motions to dismiss under the Speedy Trial Act is shaped by the largely mechanical nature of the statute itself. We must start from scratch in the computation of excludable and non-excludable time under the Act. Where we are dealing with exclusions which are not discretionary, failure to properly exclude delay or improper exclusion of delay is error as a matter of law. Where the exercise of judicial discretion is authorized, our review of the excludability of such time is guided by the "abuse of discretion" standard.

Our review here of the district court's denials of defendants' motion to dismiss for Speedy Trial Act violations involves the tracking of some sixty-three motions filed by the three defendants. Before getting

---

**9.** Delay resulting from a continuance may only be excluded "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." § 3161(h)(8)(A).

**10.** In *United States v. Mitchell,* 723 F.2d 1040 (1st Cir.1983), we held that delay resulting from pretrial motions would only be excludable under § 3161(h)(1)(F) if it were "reasonably necessary," and that such a finding was to be made by the district court before excluding any extended period of time. *Id.* at 1047.

bogged down in the detail which is necessarily entailed, it is appropriate to provide an annotated summary of the major events in this 463–day chronology. After the indictment on August 31, 1982, one motion was filed on September 10, 1982, thirty-six motions were filed on September 20, 1982, and two motions were filed on September 22, 1982. The government filed a consolidated response to all motions except those to dismiss and suppress on September 27, 1982. As a result of a hearing before a magistrate on September 27, 1982, twenty-four of the motions were decided by order of the magistrate on October 8, 1982. For our purposes, we need only note that this included the grant of discovery to the defendants. Fifteen motions were reserved for the district court judge and a hearing was set for October 25, 1982. The motions reserved for the district court fell into four major categories: motions to suppress, motions to dismiss, motions for evidentiary hearings and motions directly relating to the trial, such as voir dire. Defendants then asked for and obtained three continuances postponing the date of the hearing on these motions. The reasons given for these continuances were schedule conflicts for the defense attorneys and delays in the discovery process. The third continuance ran into a problem because it resulted in scheduling the hearing and trial later than December 15, 1982, after which time the case was to be reassigned to another judge under a plan of the district of Massachusetts to speed up the trial of both criminal and civil cases. With this in mind, the trial judge reset the trial date to January 10, 1983, subject to confirmation by the reassigned judge.

According to the record we have before us, no hearing or trial did in fact occur on January 10, 1983, and there is no record of a formal order or continuance allowing further postponement of the hearing and trial. The government finally submitted its memorandum in opposition to the motions to suppress and dismiss on March 11, 1983. On that same date, a new United States Attorney was added to the case. On May 23, 1983, a status hearing on the case was held and a hearing on the still undecided motions was set for June 14, 1983. Also on May 23, 1983, one of the defendants filed a motion to compel disclosure of the surveillance methods used to locate the Nirvana, claiming that the government was dragging its feet on discovery. On June 9, 1983, the first of the two motions to dismiss for speedy trial violations was filed. It was denied without written opinion on June 15, 1983.

In the meantime, on June 10, 1983, the government filed a motion for an *in camera ex parte* hearing on an application for a protective order for the surveillance material. On June 13, 1983, the day before the long awaited motion hearing, the court held a pretrial conference to consider the question of the *in camera ex parte* hearing. The United States Attorney indicated that he had told defense counsel "months and months ago" that he would be requesting such a hearing to protect classified surveillance information. At this point, a controversy erupted over what was required under CIPA. The hearing on the pretrial motions to dismiss and suppress was indefinitely postponed since both sides agreed that much of the substance of the motions to suppress and dismiss would depend on the disclosure of the surveillance information.

A second status conference was held on July 6, 1983. The government insisted that a letter from the Attorney General was not necessary under CIPA, as defendants claimed, and did not produce it. The court then stated that if the letter was not produced by July 13, 1983, it would seriously entertain the motions to suppress. The court nonetheless accepted the government's submission of a memo justifying its *in camera ex parte* application without the certification of the Attorney General. On July 13, 1983, the government filed a motion for a continuance of the hearing on the *in camera ex parte* application until August 3, 1983. The court granted the continuance and set a hearing on the application for August 15, 1983.

At the August 15 hearing, the government persisted in its interpretation of CIPA, which we have found was correct, and submitted to the court the secret materials it wished to have protected. Defendants objected to this submission and moved to dismiss. The court adjourned the hearing after indicating that it would take both motions under advisement.

On October 8, 1983, a hearing was held on two of the fifteen motions which had been filed September 20, 1982, and were still undecided. One was a motion for individual voir dire and the other was a motion to dismiss because of systematic underrepresentation of women as grand jury forepersons. Both were denied the day of the hearing.

The discovery issue was resolved on October 13, 1983, when the district court issued an order denying discovery to the defendants on the surveillance techniques. This paved the way for a hearing on the motions to suppress and dismiss, which took place on October 21, 1983. On that same date, the second motion to dismiss for violations of the Speedy Trial Act was filed. This was denied on November 15, 1983, as part of an order deciding the balance of the motions to dismiss and suppress. On December 5, 1983, two additional motions were filed and denied and the trial began.

■■■ We now consider how much of the 463-day pretrial period was excludable under § 3161(h). The seventy-day period begins to run when the defendant first appears before a judicial officer or when the indictment is filed, whichever occurs later. § 3161(c)(1). In this case, the defendants first appeared before a magistrate on August 23, 1982, but were not indicted until August 31, 1982. Thus we begin our computation of the seventy-day period on August 31, 1982. The day of the indictment, however, is excludable under § 3161(h)(1) as a "proceeding concerning the defendant." *United States v. Brown,* 736 F.2d 807, 808 (1st Cir.1984). Similarly, September 2, 1982, is excludable since on that day defendants were arraigned and a bail hearing took place. On September 10,

defendants filed a motion which was heard by the magistrate on September 27. Under § 3161(h)(1)(F), "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on ... such motion" shall be excluded. In *United States v. Mitchell,* 723 F.2d 1040 (1st Cir.1983), we held that (F) permitted "only such delay as is reasonably necessary from the time of filing a pretrial motion to the time of concluding a hearing on it ...." *Id.* at 1047. This seventeen-day delay is certainly within the bounds contemplated by *Mitchell.* Overlapping with this exclusion are two additional exclusions, running from September 20–27 and September 22–27, attributable to the motions filed on September 20 and 22 which were also heard on September 27. Also excludable was the period from September 27 through October 8, 1982, which covers the period during which the motions heard on the 27th were "under advisement" until the magistrate issued an order on October 8. § 3161(h)(1)(J). We note that the district court correctly excluded both the pretrial motion period from September 10 through September 27 and the under advisement period from September 27 through October 8.

■■■ As of October 8, fifteen motions were still pending because the magistrate had reserved them for the trial judge. At that point, a hearing had been set for October 25, 1982. In fact, as has been described above, these motions were not heard until October 21, 1983. This yearlong period of delay is the heart of defendants' motion to dismiss. The district court ordered this entire period excluded under (F). Since that time, however, we have made it clear that (F) only permits reasonably necessary delay between the filing of pretrial motions and a hearing on them. *Mitchell,* 723 F.2d at 1047. *Mitchell* also requires district courts to "make specific and reasonably contemporaneous statements of the reasons for any extended exclusions of time between filing and hearing ... of pretrial motions." *Id.* This is necessary if we are to be able to conduct an effective

appellate review of these exclusions. Clearly, however, the requirement of a statement of reasons was prospective only and since this order of excludable delay was made two months prior to our holding in *Mitchell,* we cannot hold the district court at fault for failing to provide us with the reasons for this delay. Nonetheless, as in *Mitchell,* we must evaluate this yearlong delay under the "reasonably necessary" standard, filling in, as much as possible, the reasons for this delay from the record before us.

■■■■■ We begin by noting that originally the hearing on pending motions was scheduled for October 25, 1982. Had the hearing in fact taken place at that time, we do not believe the seventeen-day delay from the magistrate's order to the hearing would have been unreasonable. Consequently, we think it appropriate to exclude the period from October 8 to October 25. Overlapping with this period is an exclusion from October 20–22, reflecting the filing and granting of the first motion for a continuance. The continuance of the hearing granted by the court ran from October 25 through November 15, the new hearing date. As long as the district court did not abuse its discretion in granting such a continuance, we must allow this period to be excluded. § 3161(h)(8)(A). The standard for the exclusion of delay resulting from the grant of a continuance is that the judge find that "the ends of justice served by taking such action outweigh the best interests of the public and the defendant in a speedy trial. *Id.* "[T]o insure careful consideration of the relevant factors by the trial court and to provide a reviewable record on appeal," we held in *United States v. Rush,* 738 F.2d 497, 507 (1st Cir. 1984), that reasons for such a finding should be stated in the record. None of the three continuances granted during this period are accompanied by any statement of reasons. We also held in *Rush,* however, that "it is not necessary for the court to articulate the basic facts when they are obvious and set forth in a motion for a continuance." *Id.* We find that the reasons set forth in the motion for the continu-

ance—defense counsel scheduling conflicts and unavoidable discovery delays—sufficiently supplement the continuance order to allow meaningful review.

The legislative history of the Speedy Trial Act Amendments Act of 1979 indicates that scheduling conflicts of either defense or government counsel were intended by Congress to be legitimate grounds for granting a continuance under § 3161(h)(8). The Amendments Act inserted into the list of factors to be considered by the court, "[w]hether the failure to grant such a continuance ... would unreasonably deny the defendant or the Government continuity of counsel ...." § 3161(h)(8)(B)(iv). The Senate Committee Report on this amendment indicated that this was designed to "meet the concern over scheduling conflicts caused by defense counsel's and the United States Attorneys' good faith, already scheduled commitments ... which would otherwise require a disruptive change of counsel, in order to meet the time limits." S.Rep. No. 212, 96th Cong., 1st Sess. 34–35, *reprinted in* A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974 185 (Fed.Judicial Center 1980). We therefore find that the continuance was properly granted and the period from October 25 to November 15 was excludable.

■■■■■ Overlapping with this period is the exclusion due to the filing and granting of the motion for the second continuance, November 1–2, 1982. The second continuance postponed the hearing from November 15 to November 29, 1982. It was requested for the same reasons as the previous continuance and also was properly granted. Consequently, the period from November 15 through November 29 was excludable. Looking at the district court's orders of excludable delay, we find that in response to a government request for an order of excludable delay resulting from the grant of the two continuances, the district court erroneously ordered that the period from October 20 to October 29 be excluded. This order appears to have resulted from a misreading of the govern-

ment's motion requesting the court to "exclude the period of delay, resulting from the defendants' motions for continuance filed on October 20 and October 29, 1982 ..." [11] to mean a request to exclude the period from October 20 through 29. What may properly be excluded, in addition to the actual continuance periods, was the time consumed by the filing and consideration of the continuance motions, as we have already indicated.

The third motion for a continuance was made on November 16 and was granted November 17, 1982, along with a motion to allow a defendant to travel outside the jurisdiction. These two days are therefore excludable under (F). In granting a continuance of the trial date until January 10, 1983, the district court judge noted that since the case would be assigned to a new judge before then, the trial date was subject to the confirmation of the new judge. The government has argued that this, in essence, created an open-ended continuance of the kind permitted in *Rush*, 738 F.2d at 508, extending the continuance to whatever time the new judge set for the motion hearing. If we were to accept this theory, it would mean that this continuance extended until June 14, 1983, which was the date initially set for the hearing by the new judge.[12] In *Rush* we indicated that "[i]t may well be that some sort of reasonableness limitation is appropriate to prevent continuances from delaying trials unfairly and circumventing the dismissal sanctions in the Speedy Trial Act," *id.*, but we stopped short of making this a holding. Nor need we here. This was not an open-ended continuance. A specific closing date was chosen so that the new judge would be forced to turn his or her attention to the case fairly quickly or run the risk of incurring nonexcludable delay. That it did not so work out is no reason to believe it was not intended to do so. We therefore limit the period of excludable delay due to this

third continuance to the forty-two-day period between November 29, 1982, and January 10, 1983.

The third motion for a continuance contained the statement that "all defendants in the above-captioned matter waive their rights to a speedy trial." The government asserts that this waiver should operate to exclude the period from November 16, 1982, when the motion was filed, to June 9, 1983, when a motion to dismiss for violation of the Speedy Trial Act served to revoke the waiver, citing our recent decision in *Rush*, 738 F.2d at 509. Our finding in *Rush*, however, that the waiver produced excludable delay was premised upon a concession by appellants that the waiver would have such an effect. Here, defendants argue that under the Act a defendant may waive only the right to dismissal, and that may be waived only by failing to move for dismissal under the Act prior to trial. § 3162(a)(2). They argue that this waiver provision should not be read to allow a defendant to suspend the operation of the statute altogether. Defendant's position is well supported by the legislative history. The 1979 Senate Committee Report stated:

> The Committee wishes to state, in the strongest possible terms, that any construction which holds that any of the provisions of the Speedy Trial Act is waivable by the defendant, other than his statutorily-conferred right to move for dismissal ..., is contrary to legislative intent and subversive of its primary objective: protection of the societal interest in speedy disposition of criminal cases by preventing undue delay in bringing such cases to trial.

S.Rep. No. 212, 96th Cong., 1st Sess. 28–29, *reprinted in* A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974 182 (Fed.Judicial Center 1980). While it may often be in the defendant's interest to delay the trial, Congress has determined

---

11. The district court's records indicate that the second continuance motion was filed on November 1, not October 29.

12. The June 14, 1983 hearing date was not met due to the extended controversy about the discoverability of the surveillance material. In fact, the hearing did not actually take place until October 21, 1983.

that such a delay is not in the public interest. Thus, even where such a waiver is offered, as was the case here, the statute imposes upon the court the obligation to reject it.

 It is clear that if there was a waiver in this case, it was inoperative. It is not clear, however, whether the period of delay following the waiver should be considered nonexcludable. This depends on whether or not the waiver caused or contributed to the delay.

 We first consider the possibility that the waiver caused the delay. If we were to find that the delay caused by the waiver did not stop the speedy trial clock, then we would be rewarding the defendants by enhancing their chances of dismissal. In essence, defendants would have successfully worked both sides of the street, lulling the court and prosecution into a false sense of security only to turn around later and use the waiver-induced leisurely pace of the case as grounds for dismissal. The sanction of dismissal was intended by Congress to serve as a deterrent for the failure of the United States Attorney or the court to comply with the Act. S.Rep. No. 1021, 93rd Cong., 2d Sess. 42, *reprinted in* A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974 208 (Fed. Judicial Center 1980). In such cases, the interest of both the defendant and the public in a speedy trial combine to outweigh the interest of the public in the prosecution of criminals. Where it is the conduct of the defendant or defense counsel which creates the delay, it is only the public's interest in a speedy trial which has been violated. Using the sanction of dismissal for such delay would be counterproductive because, even though it might keep the courts and the prosecution more on their toes, the possibility of dismissal would serve as a powerful incentive for defendants and defense counsel to create delay. Congress sought to prevent this by providing direct sanctions against attorneys who engage in dilatory tactics. The Act provides for sanctions against an attorney who "makes a statement for the purpose of obtaining a continuance which he knows to be false and which is material to the granting of the continuance." § 3162(b)(3). Such attorney may have his or her fee reduced by 25%, be fined up to $250, be denied the right to practice before the court for up to ninety days, or be reported to a disciplinary committee. § 3162(b). Direct attorney sanctions are particularly appropriate against offending defense attorneys since they further the public's interest in a speedy trial without sacrificing its interest in the prosecution of criminals.

 Under the Act a waiver ought not to be allowed by the district court and has no effect on a defendant's right to dismissal. Nevertheless, we hold that where a waiver creates delay such delay will be excludable. Defense counsel, as officers of the court, have a responsibility to keep in mind the twofold purpose of the Speedy Trial Act: the interest of the defendant in a speedy trial and the interest of the public in a speedy trial. To the extent the Act protects the defendant's interest, it places limits primarily on the actions of prosecutors and courts; to the extent that the Act protects the public's interest in a speedy trial, it places limits on the actions of defense counsel as well. Defense counsel may not simultaneously use the Act as a sword and a shield. We think it unethical and dishonest for defense counsel to waive the Act in the trial court and then disclaim such waiver upon appeal.

 It is also quite possible that the delay from January 10, the reassigned trial date, to May 23, 1983, when the defendants filed a motion to compel disclosure and the court held a status hearing, had nothing to do with the waiver. The delay may well have been rooted in the defendants' attempt to obtain classified information from the government. Although we have upheld the government's position as to this information, we must point out that it took an inordinate amount of time for the government to reply to defendants' motions for discovery, suppression and dismissal filed on September 20, 1982. The government did not file a response to the motions to

dismiss and suppress until March 11, 1983, and did not begin applying for a protective order on the surveillance material until June 10, 1983. The court also bears some responsibility for allowing this hiatus of inaction to continue. If the delay between January 10, 1983, and May 23, 1983, was due to the government and the court, not the defendants' waiver, then the time is nonexcludable and the indictment must be dismissed.

Our problem is that we cannot tell which of these two scenarios is an accurate description of the reasons for this delay. It was precisely for this reason that we ordered district courts to provide a statement of reasons for the exclusion of long periods of time under (F). *Mitchell*, 723 F.2d at 1047. Since *Mitchell* did not come out until December 29, 1983, we cannot fault the district court for not stating reasons for excluding the period from September 20, 1982, through October 21, 1983, the date the motions hearing finally took place. We find, however, that it is impossible to complete our review without the firsthand analysis that only the trial judge can provide. We thereby think it appropriate to remand this case to the district court for a determination of the reason for the delay which occurred between January 10 and May 23, 1983, and a finding as to whether this time is excludable or not. *See United States v. Brown*, 736 F.2d 807 (1st Cir.1984).

▮▮▮ Rather than stop at this point, we feel it appropriate to complete the computation of the excludable time from May 23 to the date of the trial, December 5, 1983, to correct errors in the district court's analysis and so the parties will know exactly where they stand.

Independent of any exclusion due to the continuing pendency of the September 20, 1982 motions, the beginning of a new excludable period was marked by the filing of a motion to compel disclosure on May 23, 1983. This motion was finally heard on August 15, 1983. Under the rule of *Mitchell*, we must consider whether this delay was reasonably necessary and we find that it was since, as already recounted, June

and July were taken up by the wrangling about the proper procedure for the court to use in determining whether the surveillance information was discoverable or not. In addition, the government obtained a continuance of the July 13 hearing. Thus, the period from May 23 to August 15 is excludable under (F). Overlapping with this exclusion is an exclusion also under (F) for the first motion for dismissal for speedy trial violations, filed June 9 and denied June 15, 1983. Two similar overlapping exclusions resulted from the government's motion for an *ex parte in camera* hearing on the Coast Guard intelligence matters, filed June 10 and heard along with the motion to compel disclosure on August 15, and defendants' motion for time to file a response to the government request for an *ex parte in camera* hearing, filed June 21 and granted June 22. The excludable delay was further extended for one day to include August 16 since defendants filed another motion to dismiss on July 14 which was denied on August 16.

▮▮▮ On October 13, 1983, the court issued its decision on the motion to compel disclosure and the application for a protective order. In its later order of excludable delay, it included the entire period from August 15 through October 13, a period of fifty-nine days. Congress has limited the period of excludable delay attributable to pretrial motions "under advisement" to thirty days. § 3161(h)(1)(J). Consequently, only the period from August 15 to September 14 may be excluded.

▮▮▮ On October 8, 1983, a hearing was held on two of the motions which had been pending from September 20, 1982: a motion for individual voir dire and a motion to dismiss because of claimed underrepresentation of women as grand jury forepersons. Both motions were denied summarily on the day of the hearing. The district court excluded the entire period from September 20, 1982, to October 8, 1983, even though it is clear that the government's response to these motions was complete on September 27, 1982, and neither motion was particularly weighty, as evidenced by the district

court's quick disposal of them on October 8. Consequently, we do not believe this delay can be considered "reasonably necessary." It is clear that the resolution of these motions was delayed because they were caught up with the motions to suppress and dismiss. There are no independent grounds for justifying the delay in hearing and resolving these two motions.

 A hearing on the remaining motions of September 20, 1982, was finally held on October 21, 1983. Much of our determination of whether this delay was reasonably necessary will depend upon the district court's findings of the reason for the delay from January 10 to May 23, 1983. Beyond that, we note that September 14, 1983, marked the date when the discovery problems should have been resolved. Consequently, we cannot find the delay created by scheduling the hearing on October 21 either reasonable or necessary. As a result, for the period from September 15 through October 21, only October 8 and October 21 may be excluded. Following the October 21 hearing, the district court issued a decision on the remaining motions. Since the date of the decision, November 15, was less than thirty days from the hearing, the entire under advisement period of twenty-five days may be excluded.

The trial began on December 5, 1983. Not counting the period from January 10 to May 23, 1983, we find a total of sixty-two nonexcludable days:

| | |
|---|---|
| September 1, 1982 | 1 day |
| September 3–9, 1982 | 7 days |
| September 15–October 7, 1983 | 23 days |
| October 9–20, 1983 | 12 days |
| November 16–December 4, 1983 | 19 days |
| Total | 62 days |

We remand this case to the district court to determine whether all or any of the period from January 10, 1983, to May 23, 1983, should be excluded. If the district court finds eight or more nonexcludable days, the seventy-day limit of the act will have been exceeded. In such an event, we direct the district court to enter an order granting defendants' motion to dismiss under the Speedy Trial Act, dismissing the indictments, either with or without prejudice, as the court believes appropriate under § 3162(a)(2) of the Speedy Trial Act. If, on the other hand, the court finds there were less than eight nonexcludable days, it shall enter an order so finding, and it shall deny defendants' motion to dismiss for violation of the Speedy Trial Act. If the court adopts this latter course, it may also impose such sanctions, if any, upon the defense attorneys as it deems appropriate.

The court's prior denial of the defendants' motion to dismiss for violations of the Speedy Trial Act is vacated, and the case is remanded for redetermination of that motion pursuant to our instructions herein.

Subject to the district court's further ruling upon the motion to dismiss as above provided, the judgments of conviction are in all other respects affirmed.

SO ORDERED.