**UNITED STATES of America,**
**Appellee,**

v.

**Jacob ZEDNER, Defendant–Appellant.**

**Docket No. 04–0821.**

United States Court of Appeals,
Second Circuit.

Argued: April 28, 2004.

Decided: March 8, 2005.

Stephen C. King, Assistant United States Attorney for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney, Emily Berger, Assistant United States Attorney, on brief), Brooklyn, NY, for Appellee.

Edward S. Zas, The Legal Aid Society, Federal Defender Div., Appeals Bureau, New York, NY, for Defendant–Appellant.

Before: LEVAL and RAGGI, Circuit Judges, and STEIN, District Judge.*

LEVAL, Circuit Judge.

Jacob Zedner appeals from his conviction after a jury trial in the United States District Court for the Eastern District of New York (Thomas C. Platt, *J.*) on six counts of attempting to defraud a financial institution in violation of 18 U.S.C. § 1344. Zedner claims, *inter alia*, that (1) lapses of time between the indictment and the start of trial violated his statutory and constitutional rights to a speedy trial; (2) the district court abused its discretion when it admitted evidence of his other bad acts; (3) the district court charged the jury incorrectly on conscious avoidance; (4) the court erred in the calculation of intended loss under U.S.S.G. § 2F1.1; (5) the district court misapprehended its authority to depart downward for diminished mental capacity and the loss amount's overstate-ment of the seriousness of the offense; and (6) the court erred in following the United States Sentencing Guidelines, which unconstitutionally deprive the defendant of the right to a jury trial. We reject contentions (1) through (4); we agree with defendant's contention (5), which requires resentencing and moots contention (6).

## BACKGROUND

In March 1996, Jacob Zedner approached a number of financial institutions to open an account using a counterfeit $10 million bond, ostensibly issued by the non-existent "Ministry of Finance of U.S.A." The bond contained numerous spelling mistakes and other errors.

The institutions uniformly refused to open an account for Zedner. One called the United States Secret Service, which arrested Zedner on March 12, 1996. A consensual search of Zedner's briefcase revealed three additional counterfeit bonds, each in the amount of $10 million, which, like the one he attempted to negotiate, were replete with mistakes.[1] The grand jury indicted Zedner on April 4, 1996 on various counts of attempting to defraud a financial institution in violation of 18 U.S.C. § 1344, and one count of knowingly possessing counterfeit bonds in violation of 18 U.S.C. § 472.

At the first status conference on June 7, 1996, Zedner's then-attorney failed to appear, and the district court entered an order excluding the delay until the next conference on June 21, 1996, under the Speedy Trial Act, 18 U.S.C. §§ 3161–3174. At the second status conference, Zedner

---

\* The Honorable Sidney H. Stein, United States District Judge for the Southern District of New York, sitting by designation.

1. Some of the bonds referred to the United States as the "Onited States" and "Thunted States," misspelled Philadelphia as "Dhtla-delphla," misspelled Chicago as "Cgicago," referred to the month August as "Augit" and "Auouit," misspelled the word dollar, and claimed to have a duration of "forevev."

failed to appear, and the proceedings were again delayed until June 26, 1996. On June 26, the court entered an order excluding delay from June 26 through September 6, 1996, by reason of the complexity of the case. On September 6, the case was again adjourned, and the court excluded the delay until November 8, 1996.

On November 8, Zedner requested an adjournment of the case through the end of January. Because the court had lengthy trials pending, the judge expressed concern that Zedner might attempt to invoke speedy trial rights at an inconvenient time and insisted on a "waiver for all time" as a condition of granting the adjournment Zedner requested. The court advised Zedner of his rights, and Zedner executed a written waiver. The district court then entered an order of adjournment to January 31, 1997. Presumably because Zedner had signed a waiver of rights under the Speedy Trial Act "for all time," the judge entered no more orders of exclusion for the duration of the case.

On January 31, 1997, the government answered ready for trial, but Zedner's counsel requested another delay. The district court granted the request and scheduled jury selection for May 5. On May 2, Zedner's counsel, James Hagney, Esq., requested to be relieved on the ground that Zedner wished to assert a defense at trial that counsel believed not to have a "basis in law or fact," namely that the bonds were genuine. The court initially denied Hagney's motion but asked a representative of the Federal Defender Division of the Legal Aid Society to serve as advisory counsel. After Zedner's subsequent completion of a financial affidavit, the court relieved Mr. Hagney and appointed the Federal Defender Division of the Legal Aid Society as Zedner's counsel.

At the May 2 hearing, the court asked Zedner whether he would be willing to submit to a psychiatric examination. With Zedner's consent, the government arranged for an examination, and the court postponed the trial date while awaiting the psychiatrist's report. The psychiatrist issued her report on August 5, 1997, concluding that Zedner was competent to stand trial.

At a status conference on September 8, 1997, Zedner complained about his new attorney and asked to represent himself without an attorney. The court authorized Zedner to proceed *pro se* with the Federal Defender Division of the Legal Aid Society serving in an advisory capacity. Zedner then sought to serve subpoenas on numerous high government officials including President Clinton, Federal Reserve Chairman Alan Greenspan, Attorney General Janet Reno, and Secretary of State Madeleine Albright. While a magistrate judge was considering various motions to quash Zedner's subpoenas, Zedner moved to dismiss the indictment on the grounds that the government had violated his civil rights and that the agents who investigated him were guilty of treason.

At the status conference on December 17, 1997, the court once again scheduled jury selection, for February 17, 1998. However, on January 30, 1998, Zedner asked the court to adjourn the trial date to allow him to serve additional subpoenas on "The Treasury Department of Treasury International Corporation" and other nonexistent entities. Over the next eight months, the court granted many motions to quash subpoenas while Zedner continued to file motions and request subpoenas for parties unconnected to his case. On October 8, 1998, the court scheduled jury selection for October 14.

The morning the trial was scheduled to begin the court consulted with counsel in

chambers while a jury panel waited. The court expressed concern that Zedner was mentally ill. The government disagreed, but moved for a psychiatric examination under 18 U.S.C. § 4241(a) in order to allay the court's concerns. The court dismissed the jury panel and inquired into Zedner's competency, concluding that Zedner was not competent to stand trial. Several days later the court ordered Zedner committed to the custody of the Attorney General for hospitalization and treatment pursuant to 18 U.S.C. § 4241(d). Zedner filed an interlocutory appeal, and in *United States v. Zedner (Zedner I)*, 193 F.3d 562 (2d Cir. 1999) (per curiam), we vacated the order of commitment and remanded for a new competency hearing on the ground that a competency hearing of a person whose competence is reasonably doubted should not proceed with that person acting as his own attorney.

The district court convened a status conference on April 4, 2000, but only the government appeared. At the rescheduled status conference held on April 27, 2000, the government and Tracey Gaffey, Esq. of the Federal Defender Division of the Legal Aid Society, now acting on Zedner's behalf, jointly requested that the court schedule the new competency hearing for July 10, 2000. The court complied, and the hearing was held as scheduled in July. At the close of the hearing, the court invited the parties to submit additional briefs on the issue of Zedner's competency. Ms. Gaffey submitted a brief on August 4 arguing that Zedner was competent to stand trial and requesting that the court schedule the case for trial "as soon as possible." The government filed a letter brief on August 11, 2000 taking the position that Zedner was incompetent to stand

trial. Zedner filed a *pro se* brief on August 23, 2000.

In November, however, while the competency motion was on submission, Ms. Gaffey became unavailable to try the case for medical reasons relating to her pregnancy. Assistant U.S. Attorney Leonard Lato explained in a later affidavit that he received a phone call in late November 2000 from the Federal Defender Division of the Legal Aid Society informing him that "Ms. Gaffey would be out of the office for a few weeks for reasons related to her pregnancy." Lato was subsequently advised that "Ms. Gaffey was unlikely to return until some time after Ms. Gaffey gave birth." A month later, Lato discussed Zedner's case with Gaffey and the two agreed that the case did not require immediate attention.[2] On March 7, 2001, Zedner moved to dismiss the indictment with prejudice under the Speedy Trial Act and the Speedy Trial Clause of the Sixth Amendment. The court issued a memorandum order on March 21, 2001 denying Zedner's motions on the grounds that the case was complex and Zedner had waived his speedy trial rights "for all time."

Returning to the issue that was submitted to the court by the August briefing, the court found Zedner incompetent to stand trial and ordered him to surrender to the Attorney General for commitment. Zedner appealed, and we affirmed. *United States v. Zedner (Zedner II)*, 29 Fed. Appx. 711 (2d Cir. Feb.21, 2002).

In May 2002, Zedner entered a federal medical facility for psychological evaluation. Near the end of his commitment, Zedner moved to extend his stay by 90 days to allow for a more comprehensive evaluation. On August 27, 2002, Zedner was released. The institution's report found that Zedner was delusional but com-

---

**2.** Although the record apparently is silent on the subject, we can confidently assume that

the trial court was notified of the fact of Ms. Gaffey's prolonged unavailability.

petent to stand trial. The district court accepted the report and scheduled jury selection to begin on April 7, 2003.

The trial focused primarily on Zedner's state of mind with respect to six efforts to open a bank account using a bogus bond. The government called representatives from the various financial institutions Zedner had approached, as well as a Secret Service agent, who testified that at the time of his arrest Zedner possessed credit cards and calling cards in at least five different names. Representatives of Citibank and American Express testified that the cards had uncollectible balances exceeding $13,000. In an effort to prove absence of fraudulent intent, the defense called as its only witness a psychologist who testified that Zedner suffered from a delusional disorder and genuinely believed the bonds he possessed were authentic. The government called two rebuttal witnesses. Both witnesses told similar stories of contacting Zedner in 1988 seeking assistance in the refinancing of a mortgage on her home. In each instance, Zedner transferred title to the home into his own name. Each witness testified that she had been obligated to sue to recover title to her house.

The jury convicted Zedner on six counts of fraud, each representing a separate attempt to open a financial account funded by a phony bond. In the presentence report, the Probation Department, using the 1995 version of the Guidelines Manual, which was in effect at the time of Zedner's crime, determined that his base offense level was 6. It recommended adding two offense levels for more than minimal planning pursuant to U.S.S.G. § 2F1.1(b)(2)(A) and seventeen levels pursuant to U.S.S.G. § 2F1.1(b)(1)(R) based on a total intended loss of $40,013,285.19.

Zedner challenged the loss calculation. He also moved for a downward departure on grounds of diminished mental capacity and that the aggregate intended loss overstated the seriousness of his offense.

The court denied all of Zedner's motions. With respect to intended loss, the court set the level at approximately $60 million based on Zedner's six attempts to pass off a bond with a face value of $10 million. The court declined to grant a downward departure, explaining on the issue of diminished capacity that the jury had rejected the argument that, by reason of his delusions, Zedner did not possess the requisite *mens rea* during the commission of his crime. The court sentenced Zedner to 63 months in prison, with credit for time served during his competency exam, and 5 years of supervised release. It also imposed a mandatory special assessment of $300.

Zedner then brought this appeal.

## DISCUSSION

### I. Speedy Trial Act

Zedner claims that his rights under the Speedy Trial Act were violated based on two periods of delay: (1) January 31, 1997 until May 2, 1997, during which the district court entered no order of exclusion while postponing trial at Zedner's request; and (2) August 11, 2000 until March 7, 2001, a period in which Zedner's competence to stand trial was in question and Zedner's attorney became unavailable because of pregnancy complications. As to both periods, we reject Zedner's contentions.

The Speedy Trial Act provides that the trial of a defendant must commence within seventy days from the date he is indicted or brought before a judicial officer, whichever occurs later, 18 U.S.C. § 3161(c)(1), failing which § 3162(a)(2) directs dismissal of the indictment. In counting the passage of seventy days, however, the district court may exclude certain periods of time

as specified in § 3161(h). For example, the speedy trial calculation does not include "delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant," § 3161(h)(1)(A); "delay resulting from any interlocutory appeal," § 3161(h)(1)(E); certain delay related to pretrial motions, § 3161(h)(1)(F); reasonable delays up to 30 days while any question is under advisement, § 3161(h)(1)(J); "[a]ny period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial," § 3161(h)(4); or any period of delay for which the district court finds on the record that the "ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," § 3161(h)(8). Although seven years passed between Zedner's indictment and the start of his trial, most of the delay falls squarely within one of these statutory grounds for exclusion.

The exclusions contained in §§ 3161(h)(1)-(7) are, for the most part, self-executing, but § 3161(h)(8) provides that no exclusion based on the "ends of justice" shall be valid "unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." The district court followed this procedure throughout 1996, entering several orders of exclusion based on the failure of Zedner's counsel to appear, the failure of Zedner to appear, and the complexity of the case. After several continuances, however, the court grew concerned that Zedner might invoke the delays he caused or requested as the basis for a motion to dismiss the indictment under the Speedy Trial Act. When counsel for Zedner requested a three-month adjournment of the case in November 1996,

the district court responded, "I think if I'm going to give you that long an adjournment, I will have to take a [speedy trial] waiver for all time. . . . I have some big cases and if I get bogged down with them you may be a long while before you get a trial." The defendant agreed to the request. His counsel assured the court, "We'[ll] waive for all time. That will not be a problem. That will not be an issue in this case." Thereafter, the court spoke directly to Zedner. It informed him, "I'm prepared to start your trial right away," and warned, "I have some fairly big cases pending in my docket, one of which is set to take eight months for trial. If you get locked in, if that starts before you start, you may have to wait until that is done." Zedner then executed both an oral and written waiver of his speedy trial rights "for all time." Thereafter, the district court did not enter any orders of exclusion based on its assumption that the waiver "for all time" removed all speedy trial issues from the case.

### A. Period from January 31, 1997 to May 2, 1997

Zedner alleges that the lapse of over 90 days between January 31, 1997 to May 2, 1997 (a period which exceeds the seventy days allowed by the Act) requires dismissal of the indictment. In denying Zedner's motion under the Speedy Trial Act, the district court relied on Zedner's waiver of his speedy trial rights "for all time." However, in *United States v. Gambino,* 59 F.3d 353 (2d Cir.1995), we ruled, like other circuits, that a defendant's waiver of rights under the Speedy Trial Act may be ineffective. *Id.* at 360. We observed that the public has a strong and independent interest in the expeditious prosecution of criminal cases. That public interest would be undermined if the provisions of the Act intended for the public

benefit could be routinely nullified by a defendant's waiver.

At the same time, however, in an effort to reach a reasonable balance between the interests of the public and of the defendant, we recognized in dictum an exception to the non-waiver rule "when defendant's conduct causes or contributes to a period of delay." *Id.* Such an exception had been previously crafted by the First Circuit in *United States v. Pringle*, 751 F.2d 419, 434 (1st Cir.1984). In *Pringle*, a defendant sought three continuances. The third motion stated that the defendants "waive their rights to a speedy trial." *Id.* at 433. The district court granted the motion and scheduled trial for two months later. *Id.* However, the trial was not held, and an additional five months passed before the filing of a motion stopped the speedy trial clock. *Id.* at 434. The record contained no explanation for the delay, and the First Circuit remanded the case to determine the cause. *Id.* at 436. It instructed the district court to exclude the five-month period from the speedy trial calculation if the district court determined on remand that the defendants' request for delay and purported waiver had induced the delay. *Id.* at´435. The First Circuit expressed concern that a contrary ruling would reward the defendants because "[i]n essence, defendants would have successfully worked both sides of the street, lulling the court and prosecution into a false sense of security only to turn around later and use the waiver-induced leisurely pace of the case as grounds for dismissal." *Id.* at 434.

The Seventh Circuit aired similar reasoning in *United States v. Kucik*, 909 F.2d 206 (7th Cir.1990). As an alternative holding rejecting the defendant's speedy trial claim, the court explained, expressing approval of *Pringle*, that a defendant who "actively participates in a continuance" cannot "then 'sand-bag' the court and the

government by counting that time in a speedy trial motion." *Id.* at 211.

The Fifth Circuit rejected that reasoning in *United States v. Willis*, 958 F.2d 60 (5th Cir.1992). Willis, who was unrepresented by counsel at the time, requested additional time to prepare for trial and, at the prompting of the district court, waived his speedy trial rights. *Id.* at 62. The district court then granted an open-ended continuance until Willis indicated he was ready for trial. Willis later moved to dismiss the indictment based on the resulting period of delay. Despite earlier Fifth Circuit dictum approving of *Pringle*, *see United States v. Kington*, 875 F.2d 1091, 1108 (5th Cir.1989), the court expressed concern that a broad exception would swallow the non-waiver rule. It agreed that "the defendant should not be allowed to argue one legal theory or characterization of facts to obtain a continuance and then argue that the district court's ruling was erroneous to seek dismissal under the Act." *Willis*, 958 F.2d at 64. But it concluded that a "district court is not sandbagged or otherwise misled ... by a defendant's simple request for or acquiescence in a continuance and its own insistence upon a waiver." *Id.* The court worried that the non-waiver rule would be "meaningless if ... the defendant waives his ability to move for dismissal of the indictment simply by asking for or agreeing to a continuance." *Id.* It therefore charged district courts with the responsibility of ensuring that any request for a continuance, even one sought or agreed to by the defendant, fall within one of the exceptions contained in the Speedy Trial Act. *Id.*

The Fourth Circuit adopted yet another approach in *United States v. Keith*, 42 F.3d 234 (4th Cir.1994). The delay in *Keith* came about when the Assistant United States Attorney fell ill several days before trial was scheduled to start. *Id.* at

236. The district court granted the government's motion for a continuance in a written order that was signed by defense counsel as "[s]een and agreed." *Id.* (alteration in original). The defense attorney later reversed course and moved to dismiss the indictment on speedy trial grounds immediately before the rescheduled trial was set to begin. After concluding that the order granting the continuance failed to meet the procedural requirements of the § 3161(h)(8) "ends of justice" exception, the Fourth Circuit turned its attention to the question of whether the defendant could use the delay acquiesced to by his counsel in support of his Speedy Trial Act claim. *Id.* at 238. The Fourth Circuit expressed concern about the breadth of the rule announced in *Pringle* and *Kucik,* which "would appear to find a waiver when a defendant consents to a continuance occasioned on *any* reason, including the district judge's desire to go fishing." *Id.* at 239. At the same time, the Fourth Circuit characterized the rule in *Willis* as "too narrow." *Id.* The Fourth Circuit instead adopted a middle position, concluding that "if a defendant affirmatively consents to a motion for a continuance and the reasons for the granting of that motion as garnered from the record are sufficient to support a finding that the ends of justice would be met by granting the motion, the defendant cannot take advantage of that discrete period of time covered by the continuance in asserting a violation of the Speedy Trial Act." *Id.* at 240.

We agree with the Fourth Circuit that the approach taken by the Fifth Circuit in *Willis* does not strike the right balance. We very much doubt that the public interest in expeditious prosecution would be served by a rule that allows defendants to request a delay and then protest the grant of their request. In our view the public interest is not advanced either by allowing such a defendant to escape prosecution altogether, or by dismissing the indictment and reindicting with consequent wasteful reprosecution after a substantial additional delay. *But see United States v. Janik,* 723 F.2d 537, 546 (7th Cir.1983).

■ We need not define the exact scope of the exception to the non-waiver rule in order to decide the case before us. At the very least, when a defendant requests an adjournment that would serve the ends of justice, that defendant will not be heard to claim that her Speedy Trial rights were violated by the court's grant of her request, regardless whether the court made an "ends of justice" finding under § 3161(h)(8).

On January 31, 1997, the government stated that it was ready to proceed to trial. Counsel for Zedner, however, indicated that he was not ready for trial and requested a continuance. The court granted the request and delayed jury selection until May 5, 1997. Given the complexity of the case and Zedner's reasonable need for additional preparations, there can be no doubt that the district court could have properly excluded this period of time based on the ends of justice. Zedner therefore cannot establish a Speedy Trial Act violation based on the grant of the delay he requested. His claim regarding January 31, 1997 to May 2, 1997 fails.[3]

*B. Period from August 2000 to March 7, 2001*

■ Zedner also alleges that the court's failure to start his trial between August

---

**3.** Notwithstanding this ruling, district courts contemplating adjournment of trial are far better advised to make prospective "ends of justice" findings under § 3161(h)(8), where appropriate, rather than to rely on defendant waivers. Reliance on waivers "for all time" seems particularly inadvisable. *See Gambino,* 59 F.3d at 359–60.

2000 and March 7, 2001, requires dismissal of the indictment. We reject his contention. Zedner could not have been tried in this period, for two reasons.[4]

First, as noted above, beginning in late November 2000, Zedner's counsel Ms. Gaffey became unavailable for trial by reason of complications resulting from her pregnancy. Ms. Gaffey's Federal Defender office advised the AUSA first that she would be out for a few weeks, and later that her unavailability would continue until some time after she gave birth. The court could not have started trial at a time when the defendant's lawyer would have been unavailable to participate.[5]

In addition, Zedner could not have been tried in this period because he was not competent to stand trial. The question of his competence was submitted in August 2000. The court held the matter under advisement for some time, but eventually found Zedner incompetent and ordered him committed. We affirmed that decision on appeal. *Zedner II,* 29 Fed. Appx. at 713. No court conferences were held during this time, perhaps because the court considered it useless to convene a conference knowing that Zedner's counsel would not be able to appear.

It might be argued on Zedner's behalf that this time during which he was not competent may not be excluded because, so far as the record reflects, the delay did not *result from* the fact that he was incompetent. Section 3161(h)(4) excludes "[a]ny period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial." The argument might be made that the court's failure either to make a record that the delay resulted from the defendant's incompetence or to start trial was at least potentially a technical violation of the Act.

The question would then be whether a defendant is entitled to have his conviction voided and the indictment dismissed by reason of the court's failure to begin trial at a time when the court could not have begun trial because the defendant was incompetent, as well as because the defendant's counsel was unavailable for trial. The failure to start trial when the defendant could not have been tried was, at worst, a harmless, technical error, and, in our view, cannot justify vacating the conviction and dismissing the indictment.

Zedner argues that a violation of the Speedy Trial Act's 70–day period for bringing a defendant to trial cannot be deemed harmless, and that dismissal of the indictment is the mandatory remedy for any violation of the statute. We disagree. As explained below, recognition of the distinction between harmless error and error affecting substantial rights furthers, rather than detracts from, the purposes of the Speedy Trial Act.

While it is true that, in some speedy trial cases, we have directed dismissal of the indictment without discussing harmless error analysis, *see, e.g., United States v. Kelly,* 45 F.3d 45, 48 (2d Cir.1995) (per curiam) (remanding to district court to determine whether dismissal should be with

---

4. We note in passing that the first thirty days after the August 23 filing of Zedner's *pro se* brief addressing his competency to stand trial clearly fall under 18 U.S.C. § 3161(h)(1)(J), which excludes "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court."

5. Of course, a district court has discretion to replace a court-appointed attorney whose unavailability will be extensive. Similarly, it may require a defendant whose retained counsel is unavailable to defend a case on the reasonable schedule established by the court to secure the services of another attorney.

or without prejudice); *United States v. Simmons*, 786 F.2d 479, 486 (2d Cir.1986) (instructing district court to dismiss indictment without prejudice); *United States v. Tunnessen*, 763 F.2d 74, 79 (2d Cir.1985) (dismissing indictment without prejudice), we held in *Gambino* that the failure to bring the defendant to trial within 70 nonexcludable days from the filing of the indictment constituted harmless error. 59 F.3d at 363. In addition, at least three circuits have required a showing of prejudice when reviewing alleged violations of the Speedy Trial Act's requirement that defendants be given at least 30 days to prepare between indictment and the start of trial. *See, e.g., United States v. Edwards*, 211 F.3d 1355, 1358 (11th Cir.2000); *United States v. Cisneros*, 112 F.3d 1272, 1277 n. 3 (5th Cir.1997); *United States v. Grosshans*, 821 F.2d 1247, 1252–53 (6th Cir.1987).

We acknowledge that these precedents do not necessarily resolve the question. There are differences. In *Gambino* the defendant had conceded that reindictment "would have been inevitable" following dismissal of the original indictment without prejudice. *Gambino*, 59 F.3d at 363. Furthermore, the exercise of statutory interpretation in the case of a violation of the 30–day preparation period required by § 3161(c)(2) is not precisely identical to that for violation of the 70–day requirement of § 3161(c)(1). Section 3162(a)(2) provides on its face that the "indictment . . . shall be dismissed" if the "defendant is not brought to trial within the time limit required by 3161(c)." The Speedy Trial Act does not contain a remedy expressly directed to failure to allow the defendant 30 days for preparation as required by § 3161(c)(2).

Nonetheless, we conclude that harmless error analysis is appropriate in Speedy Trial Act cases because of that statute's relationship to other governing statutes and rules (as well as because Congress could not reasonably have intended the absurd results that otherwise follow). Section 2111 of Title 28, United States Code, instructs appellate courts to "give judgment . . . without regard to errors or defects which do not affect the substantial rights of the parties." Federal Rule of Criminal Procedure 52(a) similarly instructs courts to disregard "[a]ny error, defect, irregularity, or variance that does not affect substantial rights." The Speedy Trial Act does not indicate that these normative principles should be disregarded, and we can see no reason why they should be.

There are excellent reasons to distinguish between errors under the Speedy Trial Act that are harmless and those that are harmful. Delay unquestionably can be prejudicial to an accused defendant. It can result in faded or lost memories, or even the death or other unavailability of witnesses. Likewise, in some circumstances, delay can be prejudicial to the public interest protected by the Act. On the other hand, failure to consider the harmlessness of certain errors under the Speedy Trial Act can result in perverse outcomes, including allowing serious crimes to go unpunished, and causing the objective of the Act to expedite the administration of criminal justice to be undermined. A case tried to a satisfactory conclusion a few days later than the Act specifies, without substantial adverse effect on anyone, can require costly retrial a year or more later, after appeal, dismissal of the indictment, and reindictment, in a manner causing vast expense, inefficiency, unfairness, and unjustifiable delay in the administration of criminal justice. We see no reason to believe Congress intended such illogical results.

■ Absent a clear indication to the contrary, we believe the Speedy Trial Act should be interpreted, like other laws, to operate consistently with the overriding prescription of 28 U.S.C. § 2111 that courts should disregard defects that do not affect substantial rights.

Needless to say, the availability of harmless error analysis does not trivialize the Act's concerns. Furthermore, as we cautioned in *Gambino*, "our holding is not a signal that affirmance of a district court's failure to dismiss an indictment on harmless error grounds ... will routinely follow. On the contrary, since we review the question of prejudice *de novo*, nondismissal in the event of a violation will always risk nullifying an entire trial." *Gambino*, 59 F.3d at 363.

The question we face is whether Zedner is entitled to have his conviction vacated and the indictment dismissed by reason of the court's failure to start trial during a period when trial could not have been conducted—because Zedner was not competent to stand trial and Zedner's counsel was not available. Zedner has failed to put forth any convincing argument that this delay prejudiced him at his trial.[6] We conclude without hesitation that the error, if any, was harmless and that Zedner is not entitled to Speedy Trial Act relief on that account.

## II. Speedy Trial Clause

■ In addition to his claims under the Speedy Trial Act, Zedner also argues that his rights under the Speedy Trial Clause of the Sixth Amendment have been violated by the seven-year delay between indict-

ment and trial. In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified four factors relevant to determining whether the Speedy Trial Clause of the Sixth Amendment has been violated: (1) length of the delay; (2) the reason for the delay; (3) whether and how the defendant asserted the speedy trial right; and, (4) prejudice to the defendant. *Id.* at 530, 92 S.Ct. 2182. The Court cautioned that "these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.* at 533, 92 S.Ct. 2182. We conclude that there was no violation of the Speedy Trial Clause of the Sixth Amendment.

It is true that the first factor, length of the delay, favors Zedner, *see United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 377 (2d Cir.1979) (54–month delay "is unquestionably substantial"), but the second factor, the reasons for the delay, weighs heavily against him. Most of the delay between indictment and trial was caused by Zedner's own requests for delay, his attempts to subpoena prominent persons and fictitious entities, the need to determine his competency to stand trial, Zedner's incompetency for a time, and two interlocutory appeals taken by him. *See United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir.1990) (citing defendant's various pretrial motions as reason weighing against defendant); *see also United States v. Mills*, 434 F.2d 266, 271 (8th Cir.1970) (holding "that delays encountered in bringing a defendant to trial who claims to be incompetent or who is temporarily incompetent ordinarily do not infringe upon his Sixth Amendment right to a speedy trial,"

---

6. Zedner complains that he was prejudiced when the government impeached the psychologist who testified as the only witness on Zedner's behalf on the ground he had not examined Zedner until years after Zedner committed his crime. The problem with this argument is that the psychiatrist examined Zedner on May 5, 2000, three months *before* the period of delay of which Zedner complains, and therefore any prejudice cannot be attributed to the district court's failure to rule expeditiously in August 2000.

and citing, *inter alia, United States v. Davis*, 365 F.2d 251 (6th Cir.1966); *Johnson v. United States*, 333 F.2d 371, 374 (10th Cir.1964)).

The third factor, whether and how the defendant asserted the speedy trial right, also weighs against Zedner. For several years, Zedner repeatedly requested continuances. His request to be tried "as soon as possible" did not come until August 2000, nearly four-and-a-half years after his indictment. *See United States v. Jones*, 91 F.3d 5, 8–9 (2d Cir.1996) (failure to assert right for four months after indictment weighs against defendant).

The fourth and final factor, prejudice to the defendant, also weighs against Zedner. Prejudice "should be assessed in the light of the interests . . . the speedy trial right was designed to protect. . . .:(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532, 92 S.Ct. 2182. Of these interests, "the most serious is the last." *Id.* Zedner was not incarcerated prior to trial and his bail conditions were not particularly onerous. He undoubtedly experienced anxiety, but the record contains no indication that the anxiety was acute. There is no indication that Zedner's ability to mount an effective defense was seriously impaired. Indeed, much of the pretrial delay resulted from the wide latitude the district court granted Zedner to prepare his defense.

Balancing the four factors identified in *Barker*, we conclude that Zedner's Sixth Amendment right to a speedy trial was not violated. The gap between indictment and trial was long, but the major part of the delay resulted from his requests for delay and serious problems concerning his competency to be tried.

## III. Rule 404(b) Evidence

Zedner claims the district court abused its discretion by admitting testimony of two rebuttal witnesses to the effect that Zedner committed frauds in 1988. The first witness testified that, when she sought Zedner's help to refinance her mortgage, he transferred the deed to her home into his own name. She had to file a lawsuit to regain title. The second witness also approached Zedner for help refinancing her mortgage. She consented to a dummy sale of her house to Zedner with the understanding that he would refinance the house in his own name to overcome her bad credit rating and then return the house to her. When Zedner asserted full ownership, the witness sued to recover title.

Federal Rule of Evidence 404(b) provides that prior act evidence "is not admissible to prove the character of a person in order to show action in conformity therewith," but "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This court considers four factors to determine whether evidence was properly admitted under Rule 404(b): "whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir.2004) (per curiam). This evidence of fraud was offered for a proper purpose and was relevant. Zedner based his defense on the claim that he was delusional and lacked criminal intent because he did not know the bonds were counterfeit. Testimony about his other fraudulent acts tended to prove Zedner's financial sophisti-

cation, his ability to execute complex schemes, and his ability to form intent to defraud. *See United States v. Downing,* 297 F.3d 52, 59 (2d Cir.2002). Although admission of other bad act evidence runs the risk that the jury will punish the defendant for the other actions rather than the charged offense, the probative value of the evidence outweighed any prejudice. Moreover, the district court reduced any risk of unfair prejudice with a carefully worded limiting instruction. Accordingly, we conclude that the district court did not err, much less abuse its discretion, when it admitted this evidence of fraud.

## IV. Conscious Avoidance

Zedner contends that the district court erroneously instructed the jury on conscious avoidance. He challenges both the decision to give the instruction and the content of the instruction. We conclude that an appropriate factual basis existed to give the conscious avoidance charge. Although the precise charge given was not ideal, no objection was made to its specific terms and its deficiencies were not so dire as to constitute plain error.

"A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt 'that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *United States v. Hopkins,* 53 F.3d 533, 542 (2d Cir.1995) (quoting *United States v. Rodriguez,* 983 F.2d 455, 458 (2d Cir.1993)). Zedner concedes that the first prong has been met because he denied knowing that the bonds were counterfeit. He contends, however, that the second prong was not met because there was an insufficient factual basis for the jury to conclude that he deliberately

chose not to inquire into whether the bonds were genuine.

Zedner relies on two main arguments. First, he points out that, contrary to what one would expect of a person avoiding the truth, he repeatedly took the bonds to different financial institutions in an attempt to determine their authenticity. The argument mischaracterizes the evidence. Zedner took the bonds to financial institutions attempting to use them in a fraudulent transaction. He insisted on the bonds' authenticity and told elaborate lies to cover for the bonds' obvious facial defects. Nor did he disclose his prior unsuccessful attempts to deposit the bonds with other institutions. We cannot say on this record it would have been irrational for a jury to conclude that Zedner avoided the truth about the bonds.

Second, Zedner argues that there was no adequate factual basis for giving a conscious avoidance charge because the jury could have concluded either that (1) Zedner was not delusional at all and therefore had actual knowledge that the bonds were counterfeit, or that (2) Zedner was delusional and did not make a conscious decision to overlook the suspect nature of the bonds because he genuinely believed they were real. He is correct that jurors could have found he actually knew the bonds were counterfeit, in which case they should have convicted, or that he genuinely believed they were genuine, in which case they should have acquitted him. But the jury could also have reasonably concluded that Zedner was aware of the high probability that the bonds were counterfeit and deliberately avoided confirmation of that fact. A conscious avoidance instruction "is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge." *Hopkins,* 53 F.3d at 542; *see also United States v. Wong,* 884 F.2d 1537, 1542 (2d

Cir.1989). We conclude that the district court made no error in its decision to instruct the jury on conscious avoidance.

We now turn to the specific language of its instruction. After the district court initially overruled Zedner's objection to giving the conscious avoid charge, the defense proposed changes to the wording of the charge. The district court accepted these changes. The defense renewed its objection to giving the charge after the jury retired, but never raised any specific objections to the content of the modified charge. Accordingly, we review the language used by the district court for plain error. *See United States v. Feroz*, 848 F.2d 359, 360–61 (2d Cir.1988) (per curiam); *United States v. Lanza*, 790 F.2d 1015, 1021 (2d Cir.1986).

In the course of its instruction, the district court said, "knowledge that Government's Exhibit 1 was a fictitious instrument may be inferred [from] circumstances that convince an average or other person that ... this is the fact." Trial Tr. at 417. Zedner argues that allowing the jury to infer knowledge from circumstances that would convince "an average or other person" that the bonds were false invited the jury to convict based on negligence. *See Rodriguez*, 983 F.2d at 458 (suggesting that conscious avoidance cannot be found merely because the circumstances " 'should have apprised [the defendant] of the unlawful nature of [his] conduct)' " (quoting *United States v. Joyce*, 542 F.2d 158, 161 (2d Cir.1976)). If this language stood alone, Zedner would have a strong point. However, we review a potentially erroneous instruction in "light of the jury charge as a whole." *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1196 (2d Cir.1989); *see also Jones v. United States*, 527 U.S. 373, 391, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (citing cases). The problematic in-

struction quoted above was given in conjunction with other passages, which told the jury, "If the defendant did not knowingly ... make material misrepresentations you must find the defendant not guilty," and that it could not convict even if the "reason that the defendant lack[ed] such knowledge ... was careless[ness] and negligen[ce] or even foolish[ness]." Trial Tr. at 417. In addition, the court said that conscious avoidance could not satisfy the knowledge requirement, regardless of what an average person would believe in the situation, if "the facts showed that the defendant actually believed that the instrument was authentic." *Id.* Reviewing the charge as a whole, we conclude that the risk of misunderstanding was substantially diminished. We therefore cannot say any error was "so obvious and seriously prejudicial to [Zedner's] substantial rights" as to warrant relief where Zedner made no objection to the content of the charge. *United States v. Bonito*, 57 F.3d 167, 174 (2d Cir.1995).

## V. Downward Departures

Zedner alleges that the district court mistakenly believed it lacked the authority to grant a downward departure on the basis of diminished mental capacity or his contention that the loss determination overstated the seriousness of the offense. The government responds that the district court understood its authority to depart but chose not to exercise that authority as a matter of discretion. The decision whether to depart is committed to the sentencing court's discretion, but we remand for resentencing when we perceive a "substantial risk that the judge misapprehended the scope of his departure authority." *United States v. Silleg*, 311 F.3d 557, 561 (2d Cir.2002) (internal quotation marks omitted).

The district court's comments at sentencing, although ambiguous, appear on occasion to conflate the standard for diminished mental capacity with the standard for failure to form criminal intent. As a result, the district court seemed to conclude that it could not grant a downward departure for diminished mental capacity in light of the jury verdict finding beyond a reasonable doubt that Zedner intended to defraud the various financial institutions he approached with his counterfeit bonds.

A downward departure for diminished mental capacity "may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. A finding of diminished mental capacity does not necessarily mean that a defendant lacked criminal intent. *See United States v. Ventrilla*, 233 F.3d 166, 169 (2d Cir.2000) (per curiam) ("[The district court's] statement suggests that it thought of diminished capacity as a question of *mens rea* for the jury to decide at trial ... rather than a question for the court at sentencing. But that is incorrect."). For example, a defendant might fully intend to defraud a business partner, but if the fraud itself was motivated by baseless delusions that the defendant needed the money to ransom a fictitious kidnap victim, a sentencing court might properly find that the defendant was less culpable and grant a downward departure. If a jury verdict convicting the defendant, and thereby indicating that the defendant formed the requisite criminal intent, precluded such a departure, it would make little sense for § 5K2.13 to appear in the Guidelines, because by the time a judge considers a downward departure for diminished mental capacity, every defendant has necessarily been found, ei-

ther based on his plea or trial evidence, to have acted with criminal intent. Indeed, an application note added to the Guidelines in 1998 stated, " 'Significantly reduced mental capacity' means the defendant, *although convicted*, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G.App. C, amend. 583 (codified at U.S.S.G. § 5K2.13, cmt. n.1) (emphasis added). Although this amendment was added after the 1995 version of the Guidelines used in this case, it merely made explicit what was already implicit in the structure of the Guidelines—a conviction does not preclude a downward departure for diminished mental capacity.

In rejecting counsel's argument for departure based on diminished mental capacity, the court said,

> You argued, I thought very successfully, to the jury, that he was suffering, if I can use that word, from a delusional complex. I think the jury might have bought it up until the last two witnesses of the people who he attempted to defraud by his machinations, and [at that] point, whatever delusional defense you had went out the window, and I'm not going to interfere with that determination by the jurors.

We cannot discern exactly what the court meant by this statement. It seems to suggest that the court believed the jury's rejection of the defendant's contention that he acted without intent to defraud precluded the court from finding diminished mental capacity that would justify a departure. If so, that was incorrect. The defendant could have acted with criminal intent so as to be guilty of the crime, while at the same time suffering from a

diminished mental capacity that would justify departure. Such a departure would in no way "interfere with" the jury's finding of guilt.

■ In two other respects the court may have misunderstood its sentencing discretion. Zedner's counsel argued that the loss calculation under U.S.S.G. § 2F1.1(b)(1) overstated the seriousness of his offense because the bonds were so obviously invalid that they were unlikely to fool any financial institution. The court responded that it "never saw anything in the sentencing guidelines" to support that contention. In fact, Comment 10 to the pertinent guideline expressly authorizes the argument Ms. Gaffey was making. It states, "In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it. In such cases, a downward departure may be warranted." U.S.S.G. § 2F1.1, cmt. n.10 (1995).

■ The court also rebuffed Ms. Gaffey's argument based on the obviously phony nature of the bonds by saying, "You argued that to the jury. They didn't buy it." That remark seems to indicate that the court believed it could not depart downward based on the obviously phony nature of the bonds because the jury had rejected Zedner's argument that he lacked a criminal state of mind on account of his delusional belief that the bonds were genuine. There is no incompatibility between a jury's finding that the defendant did not delusionally believe phony bonds were genuine and a court's conclusion that the severity of the offense was diminished by the obviously spurious nature of the bonds. *Cf. United States v. Agwu,* 5 F.3d 614, 616 (2d Cir.1993) (per curiam) (noting that a

decision not to depart pursuant to Comment 10 "is not appealable unless the refusal was based on the court's mistaken belief that it did not have the discretion to do so").

The combination of circumstances resulting from the risk that the court misconstrued its authority to depart downward and the upheaval in the federal sentencing laws resulting from the Supreme Court's decision in *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), convinces us that the best course is to remand for resentencing consistent with this opinion and in accordance with the dictates of *Booker.*

### CONCLUSION

We have considered Zedner's remaining claims and find them to be without merit. For the foregoing reasons, we **AFFIRM** the judgment of conviction, but **VACATE** the sentence and **REMAND** for resentencing.