**UNITED STATES of America,**
**Appellee,**

**v.**

**Felix VALDEZ, Defendant–Appellant.**

**Docket No. 04–3811–CR.**

United States Court of Appeals,
Second Circuit.

Argued March 4, 2005.

Decided Oct. 5, 2005.

James Cohen, New York, New York (Michael Martin, Supervising Attorney, Virginia Marciano, Anna Mercado, Todd Spiegelman, Legal Interns, Lincoln Square Legal Services, Inc., New York, New York, of counsel), for Defendant–Appellant.

Jonathan S. Kolodner, Assistant United States Attorney, New York, New York (David N. Kelley, United States Attorney, Adam B. Siegel, Assistant United States Attorney, Southern District of New York, New York, New York, of counsel), for Appellee.

Before: WALKER, Chief Judge, CARDAMONE, and B.D. PARKER, Circuit Judges.

CARDAMONE, Circuit Judge.

Defendant Felix Valdez (defendant or appellant) appeals from a judgment entered on July 12, 2004 in the United States District Court for the Southern District of New York (Duffy, J.), convicting him upon his guilty plea of wire fraud in violation of 18 U.S.C. §§ 2 and 1343. Valdez was sentenced to a term of 18 months imprisonment, three years of supervised release, and ordered to pay $249,642 in restitution and a $100 special assessment. Defendant contends on appeal that the district court improperly denied him a downward departure based on his diminished capacity because it applied the incorrect legal standard and made clearly erroneous factual findings. One of these allegedly incorrect factual findings was the district court's failure to accept Valdez's declaration that a co-conspirator, Guillermo, was the mastermind of the criminal scheme in which defendant engaged, and that his mental disabilities left him vulnerable to being led—like Pinocchio in the hands of a creative Geppetto—by Guillermo. Although we are not persuaded by Valdez's arguments, we remand this case to the district court for it to consider resentencing pursuant to *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005).

## BACKGROUND

### A. *Defendant's Offense Conduct*

Valdez was convicted for participating in a scheme in which he defrauded long-dis-

tance telephone carrier AT & T out of well over $200,000 in long distance telephone services between May 1998 and his arrest in April 2001. An acquaintance, Guillermo, taught him how to defraud AT & T by calling AT & T to retrieve calling card numbers, pin numbers, and passwords for names randomly taken from the phonebook. Access to the numbers obtained allowed defendant to place and sell thousands of domestic and international telephone calls.

Over several years, an investigator from AT & T's Network Fraud Management Department used the company's database to discover that an individual, later identified as Valdez, placed numerous illegal telephone calls from pay phones near a bus terminal in the Washington Heights area of New York City. The investigator further learned that this individual tested the validity of calling card accounts he had acquired by calling an unsubscribed telephone number in Florida and another one in Mexico. The investigator reported that the Florida test number had been called 3,300 times and the Mexico number had been called nearly 2,000 times. From these records, the company estimated its loss from fraudulent calls initiated by Valdez at $249,643.

On several occasions between December 2000 and January 2001 the investigator placed a recording device, pursuant to federal law, on the suspected pay phones. During the recorded calls, Valdez typically opened numerous accounts during a single call. He succeeded in this ruse by offering false explanations for his actions including posing as a building owner attempting to obtain numbers on behalf of his "tenants." A review of the tapes also revealed that defendant sometimes requested special access to certain countries as a means of overcoming AT & T's default prohibition on calling card calls to those countries due to numerous incidents of fraud associated with such calls.

In December 2000 AT & T's investigator notified the U.S. Secret Service of Valdez's criminal activity. During the next few months, Secret Service agents observed defendant placing calls on a pay phone on many occasions. The agents determined that these calls were for the purpose of opening AT & T calling card accounts. On some occasions Valdez was observed holding pieces of paper with numerous names and addresses on them. During one of the surveillances, defendant placed a call on a pay phone while motioning to another individual who then approached the phone and handed cash to Valdez.

On April 2, 2001 Secret Service agents arrested defendant and interviewed him. Defendant told the agents that he had obtained calling cards in other people's names and had sold calls to people on the street using those numbers. During a search of his apartment, agents found hundreds of pieces of paper containing names, addresses, calling card numbers, pin numbers, and passwords. From this evidence and the company's database, AT & T estimated that Valdez had fraudulently obtained and possessed over 1,176 calling card numbers.

### B. *Contentions of the Parties*

The primary issue on this appeal is the district court's refusal to adjust defendant's sentence downward on the grounds of significantly reduced mental capacity pursuant to U.S.S.G. § 5K2.13. In his initial sentencing submission, Valdez argued that his "diminished capacity made him unable to fully understand the wrongfulness of his actions, and to control the incident behavior." To support this contention, defendant pointed to his IQ score of 55, his documented learning difficulties, and his dependency on others. He noted

his family history of psychiatric problems and his own symptoms of mental illness. Indeed, since he was a child, psychiatrists have been concerned with his behavior. In a psychiatric evaluation conducted in 1973, for example, a school psychiatrist diagnosed Valdez, then 11 years old, with brain damage and a "severe emotional disturbance." Defendant was subsequently placed in special education classes and eventually dropped out of school.

Valdez's treating psychiatric intern diagnosed him with panic disorder or agoraphobia, meaning that he fears places where escape may be difficult. Defendant also had two sessions with a psychiatrist, Dr. N.G. Berrill, in conjunction with the present criminal proceeding. The doctor was of the opinion that Valdez also displays signs of a generalized anxiety disorder, which is characterized by excessive anxiety and worry for an extended period of time. Dr. Berrill's evaluation additionally concluded that Valdez had "marked dependency needs" which led him to be "overly compliant." Additionally, although the IQ tests administered by Dr. Berrill indicated that Valdez was functioning in a mildly impaired range with a full scale IQ of 55, the doctor observed that defendant's performance on this battery of tests was "probably not an accurate representation of his abilities" because Valdez did not appear to have "done his best" on the tests.

Defendant further contended his diminished mental capacity was causally linked to his commission of the crime, thus making a downward departure appropriate. He pointed to Dr. Berrill's conclusion that he was incapable of developing the fraud that led to his indictment. Defendant insists that Guillermo taught him how to defraud the telephone company; that he only sold cards to two men; and that he was told the scheme was necessary to make money and as a means to call his son.

The government opposed Valdez's downward departure request, while acknowledging his mental problems. The government contended defendant failed to satisfy his burden of proof because he did not meet the definition of "significantly reduced mental capacity" contained in the commentary to U.S.S.G. § 5K2.13. It pointed to evidence contradicting defendant's contention that he had difficulty understanding the wrongfulness of his actions. The government also contested the causal link alleged to exist between Valdez's deficiencies and the crime he committed. Specifically, it cited evidence that Valdez acted independently and was extensively involved in the fraud scheme.

## C.  District Court Sentencing

On June 4, 2003 the parties appeared at a sentencing conference before Judge Duffy, where Valdez's counsel reiterated the above arguments. Judge Duffy stated that while defendant might not have understood the consequences of his wrongful actions, he knew that his actions were wrong. Valdez's counsel clarified that Valdez only argued that his sense of wrong was limited, not that it was wholly absent. The district court judge interjected that if Valdez did not wholly understand wrongfulness, then Valdez "would ... have an entirely different basis," apparently referring to an insanity defense that Valdez could have raised in such case. The district judge repeated his previous comment that Valdez knew what he was doing was wrong.

The district court disputed defendant's characterization of the facts, suggesting defendant initiated the illegal activity on his own after learning it from Guillermo. In October 2003 defense counsel submitted a second letter to the district court assert-

ing that Guillermo's role was "active, regular, and sustained." Valdez stated he paid Guillermo $50 per week for Guillermo's help in reading names to defendant from the phone book, and that defendant was easily manipulated by Guillermo because of his low IQ. The government responded by pointing to Dr. Berrill's report that stated Valdez refused to pay Guillermo.

On April 20, 2004 another sentencing conference was held. Valdez presented a new tentative diagnosis of bipolar disorder. On June 24, 2004 Dr. Berrill testified that Valdez suffered from clear cognitive defects, could barely read or write, and had an anxiety disorder. Dr. Berrill further testified that Valdez was "extremely dependent on others" and that, because of these problems, Valdez could not have thought of the scheme himself, nor did he have the capacity to engage in the conduct without reenforcement. Defendant's counsel asked Dr. Berrill whether Valdez knew right from wrong, to which Dr. Berrill responded: "Well, on some levels he does.... I think the real issue is the nuance, the subtlety of the issue of wrong." The doctor further elaborated that although Valdez "might be able to tell right from wrong" he did not understand the degree of wrong or the full implications of his actions. On cross-examination, Dr. Berrill testified that Valdez told him he had been caught "scheming the telephone company" and that he knew what he was doing was wrong. Dr. Berrill also acknowledged Valdez could have written down the hundreds of names and numbers himself.

At the end of Dr. Berrill's testimony, the district court sentenced defendant. The court concluded that a report by Valdez's treating physician did not indicate defendant could not differentiate between right or wrong. Defense counsel then contended that whether Valdez knew right from wrong was not the proper legal standard

to apply in this case. The district court further found that the evidence did not support the proposition that Valdez had a "severely diminished capacity," bipolar disorder, or severe anxiety. The court denied defendant's other requested bases for a downward departure and sentenced Valdez to 18 months imprisonment, the minimum sentence under the applicable Sentencing Guidelines.

## DISCUSSION

### I   *Crosby* Remand

Appellant's challenge to his sentence is a ruling affected by the remedy crafted by the Supreme Court in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 764–67, 160 L.Ed.2d 621 (2005). In that case the Supreme Court declared that in order to avoid a Sixth Amendment violation, the Sentencing Guidelines are no longer mandatory. Although Valdez does not assert that his original sentence violated the Sixth Amendment, his sentence involved procedural error because it was imposed on the assumption that the Guidelines were mandatory, and without proper attention to the various factors contained in 18 U.S.C. § 3553(a) that sentencing courts must take account of in deciding on an appropriate sentence. *Id.* at 764–65. Hence, a remand for the district court judge to consider whether the original sentence would have been materially different under advisory Guidelines pursuant to *United States v. Crosby*, 397 F.3d 103, as requested by defendant at oral argument, is appropriate. Valdez asks us in granting the remand to send this case to a different district court judge. We deny this request because there is nothing in the record that casts doubt on the district judge's fairness or the appearance of his fairness. *See United States v. Stevens*, 192 F.3d 263, 269 (2d Cir.1999).

■ We do set forth our views on the Guidelines issues raised on this appeal prior to issuing this *Crosby* remand. The correct application of Guidelines sentences has force even under the discretionary sentencing regime imposed by *Booker* because a district court must first consider the proper Guidelines range even when it decides to vary from them. 18 U.S.C. § 3553(a); *Booker,* 125 S.Ct. at 764–65; *United States v. Maloney,* 406 F.3d 149, 152 (2d Cir.2005).

## II   Trial Court's Application of the Law

### A.   *Legal Standard for Downward Departure on the Ground of Diminished Capacity*

#### 1.   Standard of Review and Relevant Law

■ On appeal, Valdez contends the district court incorrectly applied the Guidelines by using the wrong legal standard when it denied a downward departure for diminished capacity. Although a refusal to downwardly depart is generally not appealable, review is available when a sentencing court misapprehended the scope of its authority to depart or the sentence was otherwise illegal. *United States v. Burgos,* 324 F.3d 88, 93 (2d Cir.2003); *United States v. Bonner,* 313 F.3d 110, 112 (2d Cir.2002) (per curiam); *United States v. Galvez–Falconi,* 174 F.3d 255, 257 (2d Cir. 1999).

■ A trial court may exercise its discretion to grant a downward departure on the ground of diminished capacity if the defendant "committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. § 5K2.13. There must also be a causal link between the diminished capacity and the charged offense. *Id.* The defendant must prove both of these elements by a preponderance of the evidence. *See United States v.*

*Gambino,* 106 F.3d 1105, 1110 (2d Cir. 1997). The Commentary Application Note for the Guideline defines "significantly reduced mental capacity" as meaning that "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, cmt. n. 1. Valdez urges that the district court's remarks at sentencing indicate it misapplied § 5K2.13 of the Guidelines by not recognizing the availability of this departure when a defendant understands the stark difference between right and wrong but possesses a significantly impaired ability to understand the wrongfulness of his conduct.

■ The inclusion of *convicted* defendants in the commentary to § 5K2.13 makes evident that a downward departure for diminished mental capacity does not necessarily require that the defendant lacked criminal intent. *United States v. Zedner,* 401 F.3d 36, 52–53 (2d Cir.2005); *United States v. Ventrilla,* 233 F.3d 166, 169 (2d Cir.2000) (per curiam). The standard here for granting a downward departure on the basis for diminished mental capacity is not that the defendant recognizes the difference between right and wrong, which may negate intent, but rather that his diminished mental capacity significantly *impaired* his judgment or his ability to understand the wrongfulness of his actions.

#### 2.   Legal Standard Applied by the District Court

■ Valdez argues that the district court's refusal to depart downward rested on its use of the improper standard, namely the standard for an insanity defense. To support this argument, Valdez points to the court's numerous discussions as to

whether the defendant knew right from wrong. While we agree that knowledge of right from wrong would have been an incorrect standard, we think Valdez mischaracterizes the standard the court, in fact, applied. The record indicates that the court considered Valdez's knowledge of right from wrong in order to inform its ultimate finding that Valdez was not "suffering from a significantly reduced mental capacity [that] . . . contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. Consequently, we understand the district court to have applied the proper standard.

Immediately prior to its ruling on the departure, Valdez's counsel informed the district court that Valdez's ability to differentiate between right and wrong did not prohibit the court from exercising its discretion to downwardly depart. In response, the district court judge said that he could not find Valdez's impairment was severe in light of the psychiatrist's testimony, Valdez's extensive involvement in the fraud, and defendant's ability to process complex information. Specifically, the district court relied on the fact that Valdez manipulated others by posing as another person, committed the offense for which he was charged over 1,000 times, and in order to do that kept track of hundreds of calling card numbers. The district court also reasoned that despite Valdez's diagnosis of agoraphobia, he chose to work and did so successfully in crowded bus terminals, and that he exhibited no symptoms of bipolar disorder.

A defendant's understanding of reprehensibility falls along a continuum and his comprehension need not land in the abyss to justify a departure. But in asking whether defendant knew right from wrong, the district court elicited responses that allowed it to assess at which point along the continuum Valdez's understand-

ing fell. Valdez's psychiatrist's response to this question was that Valdez knew right from wrong, yet the psychiatrist also elaborated that Valdez did not fully understand the degree of wrongfulness or the consequences of his actions. Moreover, in its final statements on the issue the district court gave additional reasons why defendant's mental condition did not severely impair his ability to understand wrongfulness, indicating that its ruling did not hinge upon whether Valdez knew right from wrong.

A case where we expressed doubt about whether the district court understood its authority to depart downward stands in contrast to the circumstances here. *See Zedner,* 401 F.3d at 52–53. There we vacated the district court sentence for having conflated the standard for diminished mental capacity with the standard for failure to form criminal intent. We ruled instead that the Guidelines leave open the possibility that a "defendant could have acted with criminal intent so as to be guilty of the crime, while at the same time suffering from a diminished mental capacity that would justify departure." *Id.*

Here the district court never implied that a complete inability to understand the difference between right and wrong would satisfy the requirements for a departure. To the contrary, it recognized the defendant would have an insanity defense under 18 U.S.C. § 17(a), which requires "that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality of the wrongfulness of his acts," if such was the case. This comment indicates that the district court understood the difference in degree of impairment between the standard required for a downward departure on a diminished mental

capacity ground and that required for an insanity defense.

### B.  *Rejection of Psychological Evidence*

■ Appellant next contends the district court committed an error of law when it substituted its lay opinion of his mental capacity in place of contrary evidence submitted by medical professionals.  We cannot adopt this contention.  In determining whether a downward departure is warranted on the basis of diminished capacity, a district court is not required to accept evidence concerning a defendant's mental and emotional states offered by defendant's own expert, but rather may rely on its own assessment of defendant's mental state based upon its observations, even when they conflict with those of the expert.  *See United States v. Leandre,* 132 F.3d 796, 807 (D.C.Cir.1998).

■ Dr. Berrill administered a battery of tests that determined defendant had an IQ of 55, thus concluding that Valdez had mild mental retardation.  While considering the psychological reports and this testimony, the district court relied on its own observations of Valdez and his proven criminal conduct in concluding that defendant's mental capacity was not sufficiently reduced to warrant a departure.  The rejection of the conclusions of Valdez's experts is not an error of law because there is no rule that obliges a trial court to adopt expert testimony.  *See, e.g., United States v. White,* 71 F.3d 920, 929 (D.C.Cir.1995) (holding that a district court may deny defendant's request for downward departure on grounds of diminished capacity and reject contrary expert testimony); *United States v. Ramirez,* 154 F.Supp.2d 774, 777 (S.D.N.Y.2001) (same).  As a consequence, the sentencing court is free to make its own analysis of Valdez's condition, so long as such analysis is based upon findings that are not clearly erroneous.  *United*

*States v. Silleg,* 311 F.3d 557, 564 (2d Cir.2002).

### III  The District Court's Factual Findings

■ Appellant also asserts he is entitled to a new sentencing proceeding because the district court's factual finding that defendant did not have mental and emotional afflictions that could serve as the basis of a downward departure for diminished capacity was clearly erroneous.  In reviewing a district court's decision not to downwardly depart, we review for clear error the factual findings from which such a decision arose.  *Id.; Bonner,* 313 F.3d at 112; *United States v. Haynes,* 985 F.2d 65, 68 (2d Cir.1993); *United States v. Mickens,* 977 F.2d 69, 72 (2d Cir.1992).

We do not think the district court's findings in this case were clearly erroneous because they were well supported by the record evidence.  The district court explicitly recognized that appellant had emotional and mental impairments, and simply questioned whether those impairments were of such severity as to support a diminished capacity downward departure.  It concluded they were not.

The determination that the impairment was not severe was validated by various pieces of proof, including the nature of the fraudulent scheme.  The scheme's complexity is manifested dramatically by the hundreds of written records kept by Valdez, proof that defendant was able to execute this fraudulent plan for a period of years by opening numerous accounts, going to such extreme lengths as assuming different identities, and by obtaining access to countries with high barriers to fraudulent entry.  As such, it was not clearly erroneous for the district court to find that Valdez's abilities, as shown by his criminal conduct, were far from extremely limited.  Although the results of Valdez's

IQ test indicate otherwise, Dr. Berrill, the defendant's own expert, noted that defendant appeared to be distracted during his aptitude tests and was "likely to have not done his best." The district court, in light of this, did not err in finding that Valdez malingered on the IQ tests.

Moreover, the evidence supported the district court's finding that appellant failed to establish the requisite causal link between his participation in the offense and his reduced mental capacity. Defendant maintained that his dependence upon others caused him to be taken advantage of. Yet, he told Dr. Berrill that he had refused to pay Guillermo, suggesting that Guillermo did not really exercise much, if any, control over him. This finding is bolstered by the Secret Service agents' observation of defendant operating on his own. Although appellant declared the person to whom he sold a card was actually Guillermo, the district court did not err in finding this incredible because it is illogical that Guillermo, the supposed teacher, would purchase a card from Valdez, the proclaimed student.

Valdez also insists his receipt of mental health treatment following his arrest warranted a departure for extraordinary rehabilitation. As previously stated, we do not ordinarily review, except in several defined situations, a district court's refusal to downwardly depart. *United States v. Fernandez*, 127 F.3d 277, 282 (2d Cir.1997). Valdez contends appellate review is appropriate here under these exceptions because the denial of this departure was based upon the district court's allegedly erroneous assessment of his mental and emotional abilities and its allegedly illegal dismissal of the opinions of the defendant's expert. We have previously rejected these arguments and Valdez has not asserted any grounds for us to review the district court's decision to deny a downward departure for extraordinary rehabilitation.

## CONCLUSION

Accordingly, for the reasons stated, the district court did not apply the incorrect legal standard in denying a downward departure for diminished capacity, nor was the decision based upon clearly erroneous factual findings. Thus, while we affirm the district court's calculation of defendant's sentence, we remand this case to the district court for consideration of re-sentencing under *Crosby*.

Remanded.